Jennifer A. Lenze, CA Bar # 246858
LENZE LAWYERS, PLC.
999 Corporate Drive, Suite 100
Ladera Ranch, CA 92694
Telephone: (310) 322-8800
Facsimile: (310) 322-8811
jlenze@lenzelawyers.com

ELIZABETH A. FEGAN (*admission* pending)
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone: 312.741.1019
Facsimile: 312.264.0100
beth@feganscott.com

JONATHAN D. LINDENFELD (*pro hac vice* forthcoming)
FEGAN SCOTT LLC
305 Broadway, 7th Floor
New York, NY 10007
Telephone: 332.216.2101
Facsimile: 917.725.9346
jonathan@feganscott.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMY DOUCETTE and MEREDITH TONGUE, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>            v.<br><br>KIA AMERICA, INC., KIA CORPORATION, HYUNDAI MOTOR AMERICA, and HYUNDAI MOTOR COMPANY,<br><br>                    Defendants. | Case No.: 8:24-cv-00731<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    JURISDICTION .................................................................................................. 4

   A. The Court may exercise personal jurisdiction over HMC and KC. ....................... 4

      1.  HMC's and KC's forum-related activities ....................................................... 4

      2.  HMC's and KC's control over HMA and KC. ................................................. 6

III.   PARTIES .............................................................................................................. 9

   A. Plaintiffs ................................................................................................................ 9

   B. Defendants ........................................................................................................... 12

IV.    SUBSTANTIVE ALLEGATIONS .................................................................. 15

   A. Hyundai and Kia become one of the most popular automakers in the United States
      by promoting the safety and reliability of their vehicles. ..................................... 15

   B. Hyundai and Kia vehicles have the same designs, components, and suppliers. ... 23

   C. Engine Clutch Actuators are necessary for the safe and reliable operation of the
      hybrid Class Vehicles ......................................................................................... 24

   D. The ECAs installed in the Class Vehicles contain a defect that results in engine
      stalls and vehicle fires ........................................................................................ 32

   E. Defendants knowingly manufactured and sold over one hundred thousand Class
      Vehicles that contain a deadly defect. ................................................................ 34

      1.  Defendants' Pre-Sale Testing and Quality Control Measures ........................ 35

      2.  Defendants' long history of defective components causing electrical short
          circuits in their vehicles. ............................................................................... 41

      3.  Defendants' 2018 Recalls of the ECAs. ........................................................ 42

      4.  Defendants' monitoring of customer complaints and warranty claims. .......... 43

   F. Despite their knowledge of the Defect, Defendants have yet to recall all Class
      Vehicles due to the Defect or offer a complete remedy. ..................................... 46

   G. HMA and KA falsely claim to offer the best warranty program in the nation, yet
      fail to offer a remedy for the Defect. .................................................................. 51

   H. Fraudulent Omission/Concealment Allegations ................................................. 53

CLASS ACTION COMPLAINT

V.   TOLLING OF STATUTES OF LIMITATIONS.................................................. 55

   A. Discovery Rule ..................................................................................... 55

   B. Fraudulent Concealment........................................................................ 56

   C. Estoppel ................................................................................................ 57

VI.   CALIFORNIA LAW APPLIES TO NATIONWIDE CLAIMS ........................... 58

VII. CLASS ALLEGATIONS .................................................................................. 66

VIII. CAUSES OF ACTION ...................................................................................... 69

   1ST - VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES
   ACT, Cal. Civ. Code § 1750, *et seq*. ("CLRA") ..................................... 69

   2ND - VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, Cal.
   Bus. & Prof. Code § 17200 ("UCL") ....................................................... 74

   3RD - VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW, Cal.
   Bus. & Prof. Code § 17500, *et seq*. ("FAL") ......................................... 75

   4TH - BREACH OF IMPLIED WARRANTY, Cal. Com. Code §§ 2314 and
   10212 ....................................................................................................... 77

   5TH - BREACH OF EXPRESS WARRANTY, Cal. Com. Code §§ 2313 and
   10214 ....................................................................................................... 81

   6TH - STRICT PRODUCT LIABILITY ..................................................... 85

   7TH - UNJUST ENRICHMENT.................................................................. 86

   8TH - VIOLATION OF THE DECEPTIVE ACTS OR PRACTICES PROHIBITED
   BY MASSACHUSETTS LAW, Mass. Gen. Laws ch. 93a, § 1, *et seq*............... 88

   9TH - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY, Mass.
   Gen. Laws ch. 106, §§ 2-314 and 2A-212.............................................. 92

   10TH - BREACH OF EXPRESS WARRANTY, Mass. Gen. Laws ch. 106, §§ 2-
   313, 2A-103 and 2A-210 *et seq*.............................................................. 95

   11TH - BREACH OF EXPRESS WARRANTY, Ga. Code Ann. §§ 11-2-313 and
   11-2A-210............................................................................................... 99

   12TH - BREACH OF IMPLIED WARRANTY, Ga. Code Ann. §§ 11-2-314 and 11-
   2A-212 ................................................................................................... 103

   13TH - VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE
   PRACTICES ACT, Ga. Code Ann. § 10-1-370, *et seq*....................... 106

14TH - VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT, Ga. Code Ann. § § 10-1-390, *et seq*. ...................................................... 110

REQUEST FOR RELIEF ........................................................................ 112

IX.   DEMAND FOR JURY TRIAL ............................................................ 113

CLASS ACTION COMPLAINT

Plaintiffs Amy Doucette and Meredith Tongue (collectively, "Plaintiffs"), individually and on behalf of all those similarly situated, complain of Defendants Kia America, Inc., formerly known as KIA Motors America, Inc. ("KA"), KIA Corporation, formerly known as KIA Motors Corporation ("KC," and with KA, "Kia"), Hyundai Motor Company ("HMC"), Hyundai Motor America ("HMA," and with HMC, "Hyundai") (Kia and Hyundai are collectively referred to as "Defendants"), based upon their personal knowledge as to facts specific to them and based upon the investigation of counsel in all other respects, as follows:

# I.    INTRODUCTION

1.    An automobile purchase is one of the most expensive and important decisions consumers make. Consumers rely upon automakers' superior knowledge to manufacture and sell cars that are safe and free from defects. Defendants readily acknowledge that "[a]ny fault in your car can affect your safety."[1] Should a manufacturer or distributor learn of any safety defects in its vehicles, it is imperative and a legal requirement for it to immediately warn the public and provide a complete repair.

2.    Despite these important duties, Defendants knowingly sold and failed to repair at least one hundred thousand Class Vehicles[2] containing a potentially deadly defect lurking in their vehicles' drivetrain system—putting countless lives at risk to this day.

3.    The Class Vehicles are hybrid electric vehicles ("HEV"). "Hybrid electric vehicles are powered by an internal combustion engine [('ICE')] and one or more electric motors, which uses energy stored in batteries."[3] The Class Vehicles are designed to and marketed as having the ability to seamlessly switch between their ICE and electric motors

---

[1] https://www.kia.com/fj/experience/innovation-story/performance.Kappa.html (last accessed March 14, 2024).

[2] The Class Vehicles are comprised of 2017-2022 Kia Niro Hybrid, 2018-2022 Kia Niro Plug-In Hybrid, and 2017-2022 Hyundai Ioniq Hybrid vehicles.

[3] https://afdc.energy.gov/vehicles/how-do-hybrid-electric-cars-work (last accessed March 14, 2024).

while being driven, thereby minimizing fuel consumption and emissions. And while the electric motors in the Class Vehicles are used to start the vehicles, ICE power is required to accelerate the vehicles.

4.     In July 2023, KA finally revealed that the Kia Class Vehicles contain a potentially deadly defect in the engine clutch system ("2023 Recall"). The engine clutch system—*viz.*, the Engine Clutch Actuator ("ECA"), controls when the vehicle switches between ICE and electric motor power. The defect allows fluid to enter the ECA, also referred to as the Hydraulic Clutch Actuator ("HCA"), and contaminates its printed circuit board ("PCB"). And when moisture enters the electrified ECA component, a short circuit is formed which creates a high likelihood that a fire will erupt in the vehicle's engine compartment. KA warns that "[a] fire increases the [safety] risk of injury." (Referred to herein as the "Defect.").

5.     Defendants are alleged to have been aware of the Defect before KA ever acknowledged its existence.  Defendants are experienced (and tout themselves as such) in the design and manufacture of consumer vehicles and conduct durability tests on all of its components, including ECAs, to verify the parts are free from defects and comply with their specifications.  Defendants also have access to numerous sources of reports of Class Vehicle failures caused by the Defect, including pre-sale testing, their own records of customer complaints, dealership repair records, warranty claims, three safety recalls issued in 2018 concerning the ECAs installed in certain Class Vehicles, and Hyundai and Kia's long history of defective components causing electrical short circuits in their vehicles and each Defendant's post sale monitoring of Class Vehicles for safety defects.

6.     Critically, the "remedy" offered by KA in the 2023 Recall does not repair the Defect, nor does it even address its cause. As part of the Recall, KA will install a fuse that is designed to blow in the event an ECA experiences a short circuit, cutting off power to the ECA. Thus, KA's solution to the Defect leaves the cause of the Defect wholly intact and by design will cause Class Vehicles to stall when short circuits occur. KA's

"remedy" is barely a band-aid for a deadly Defect which requires a comprehensive fix or replacement of defective ECAs to make these vehicles safe and reliable.

7.    Finally, while the ECAs installed in the Kia Class Vehicles are the same as those installed in the Hyundai Class Vehicles, Hyundai has yet to issue a safety recall or attempt to fix the Defect found in Hyundai Class Vehicles.

8.    Defendants' abhorrent disregard for the safety of their consumers came at a total surprise to Plaintiffs and other Class Members who were repeatedly told by Defendants that their vehicles undergo many hours of detailed pre-sale durability testing and that the manufacturers place an emphasis on "quality and durability." Moreover, Plaintiffs and other Class Members were outraged to learn that despite advertisements that Defendants offered "industry lead[ing]" warranty programs and "America's Best Warranty," Defendants would do all they could to conceal the Defect and skirt their obligations to repair or replace the defective ECAs.

9.    Had Plaintiffs and other Class Members known of the Defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles or would have paid substantially less for them.

10.    As a result of Defendants' unfair, deceptive, and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiffs and Class Members, have suffered an ascertainable loss of money and/or property in the form of, for example, loss of value, loss of use of the vehicles, and repair costs.

11.    Accordingly, Plaintiffs bring this action to redress Defendants' misconduct. Plaintiffs seek equitable relief in the form of an adequate remedy for the Defect, an appropriate curative notice regarding the existence of the Defect, recovery of damages, a repair under state consumer-protection statutes and express and implied warranties, and reimbursement of all expenses associated with the repair or replacement of the Class Vehicle and damage caused by the Defect.

## II.  JURISDICTION

12.    This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §§1332(d)(2) and (6) because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

13.    Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendants transact substantial business and because HMA and KA are headquartered in this district. HMA and KA advertised in this district and Defendants received substantial revenue and profits from sales and/or leases of the Class Vehicles in this district. Defendants also have research and development offices in this district. Therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

14.    This Court has personal jurisdiction over Defendants by virtue of their transactions and business conducted in this judicial district, and because HMA and KA are headquartered in California. Defendants have transacted and done business, and violated statutory and common law, in the State of California and in this judicial district.

**A. The Court may exercise personal jurisdiction over HMC and KC.**

15.    More specifically, the Court has specific jurisdiction over HMC and KC pursuant to the long-arm statute of California (Cal. Code Civ. Proc. § 410.10) based on their forum-related activities from which this case arises, and the forum-related activities of HMC's and KC's primary domestic subsidiaries, HMA and KA, which HMC and KC, respectively, substantially control.

**1.    HMC's and KC's forum-related activities**

16.    HMC and KC design, manufacture, market, distribute, and sell the Class Vehicles under their registered trademarks "Hyundai" and "Kia." From 2010 to the

present, when Class Vehicles were sold and marketed to Class Members—HMC and KC purposefully availed themselves of the United States' legal protections by registering and maintaining registrations with the United States government for trademarks associated with their vehicles and parts, which HMC and KC used to identify and distinguish their vehicles and parts in the United States, this District, and transferor jurisdictions.

17.    HMC and KC purposely availed themselves of markets in the United States, each selling over half a million vehicles per year in this market through their respective domestic subsidiaries, HMA and KA. *See infra* ¶¶ 72-77. Indeed, HMC and KA have purposefully availed themselves of the protections of various statutes of the United States and California common law by filing lawsuits in this District.

18.    HMC and KC both are global automobile manufacturers who purposely availed themselves of the automobile and automobile-related products' markets in California by extensively promoting, warranting, selling, leasing and servicing, directly and indirectly, vehicles (including the Class Vehicles) and related automobile products in California. Those Class Vehicles were defective and otherwise violated federal and California laws (as alleged herein) resulting in significant damages to Class Members in California.

19.    As alleged below, HMC and KC promote on their own websites all Hyundai and Kia vehicles sold by HMA and KA in the United States and direct U.S. consumers to their U.S. subsidiaries' websites.

20.    HMC and KC manufactured over one hundred thousand Class Vehicles, which were delivered to HMA and KA for sale in the United States. Although HMC and KC manufactured Class Vehicles in Korea, they specifically segregated them from other Class Vehicles that were intended for sale in other countries, placed certification labels on them that assured compliance with U.S. federal safety requirements, and ensured those Class Vehicles shipped to the United States with full knowledge that HMA and KA would then distribute them across the United States.

CLASS ACTION COMPLAINT

21.    These Class Vehicles were not merely placed into a stream of commerce—they were directly targeted to the United States market, including California. HMA and KA certified that the vehicles complied with United States safety requirements and ensured that they shipped directly to a wholly owned subsidiary responsible for distribution in the United States.

22.    HMC and KC affixed federal safety certification labels to the Class Vehicles manufactured in Korea, and directly approved the same labels for Class Vehicles manufactured in the United States, in each case knowing that they would be sold in the United States. The certification labels represented that the Class Vehicles conformed to U.S. safety standards, thereby enabling the vehicles to be sold in all 50 states.

23.    HMC and KC played key roles in HMA's and KA's analysis and decision-making relating to the design and/or manufacturing of the Class Vehicles sold in the United States containing the Defect, including the engine clutch system and ECAs. Moreover, KC was intimately involved with the investigations concerning the cause of the Defect, whether to issue a recall over the Defect and what the proposed remedy would be.[4]  Likewise, HMC plays an integral role when deciding whether to issue a recall for Class Vehicles.[5]

24.    On information and belief, HMC and KC were intimately involved with HMA's and KA's monitoring of customer complaints and warranty claims relating to the Defect, their attempts to remedy the Defect, and the issuance of the 2023 Recall (defined below).

**2.    HMC's and KC's control over HMA and KC.**

25.    HMC and KC exercise control over HMA and KA, respectively, through several formal and informal mechanisms.

---

[4] https://static.nhtsa.gov/odi/rcl/2023/RMISC-23V534-5049.pdf (last accessed March 14, 2024).

[5] https://static.nhtsa.gov/odi/rcl/2018/RMISC-18V260-6639.pdf (last accessed March 14, 2024).

26.    Upon information and belief, HMC and KC have the power to appoint board members to HMA and KA, respectively. They have exercised this power to appoint board members to these subsidiaries that they believe will manage the subsidiaries with the principal goal of benefiting them.

27.    HMC and KC purposely availed themselves of markets in the United States. For example, HMC and KC each regularly submitted applications to the EPA to obtain certification necessary for the sale of their vehicles in the United States.[6]

28.    HMC maintains a "Global Command and Control Center" on the second floor of its headquarters in Korea.[7] The Center operates around the clock and boasts dozens of screens relaying live data and video feeds from all of Hyundai and Kia's assembly lines and research centers around the world. The production data is generated on the assembly lines and displayed on boards where team members can see it, and headquarters can see the same data at the same time. From the Global Command and Control Center, HMC controls Hyundai operations around the world, including those in the United States.

29.    On information and belief, KC representatives also monitor Kia's global operations from HMC's Global Command and Control Center.

30.    If HMC's or KC's quality monitors in Korea spot errors or problems, they call the factory immediately. Additionally, employees of HMA and KA report on quality issues to HMC and KC, respectively. For instance, one of the Hyundai plants monitored at the Global Command and Control Center is located in Alabama. That plant's

---

[6] *E.g.*, https://www.epa.gov/sites/default/files/2019-07/documents/kmc-off-cycle-ghg-credit-high-efficiency-alternator-2019-06-10.pdf (last accessed March 14, 2024); https://www.epa.gov/system/files/documents/2022-09/hyundai-ghg-credit-pwm-hvac-blm-apl-2020-12-15.pdf (last accessed March 14, 2024).

[7] https://digitaledition.strategy-business.com/publication/?i=145911&p=70 (last accessed March 14, 2024).

CLASS ACTION COMPLAINT

production chief was quoted as saying, "if there's a hiccup at any of those boards, headquarters wants to know what needs to be done about it – right now."[8]

31.    Senior Korean executives at HMC and KC also regularly visit Hyundai and Kia plants and offices in the United States, including HMA's and KA's California headquarters.

32.    Korean speaking "coordinators" reportedly work at HMA and KA and report on their activities to Korean executives at HMC and KC, respectively, every business day.

33.    HMC and HMA and KC and KA, respectively, share common executives. For example, Jose Muñoz is the President and Global Chief Operating Officer of HMC as well as the President of HMA.[9] HMC states that "[b]ased in Hyundai's U.S. headquarters in Fountain Valley, California, Muñoz also oversees the entire American market, including Hyundai Motor North, Central and South America, as the head of the Hyundai Motor Americas Region." Brian Latouf serves as the President and Global Chief Safety and Quality Officer for HMC, as well as the chief safety officer of HMA.[10]

34.    KC and KA also share common employees. For example, SeungKyu (Sean) Yoon currently serves as President and CEO of KA, and he is the President & CEO of the Kia North America Region.[11] Prior to his current role, Mr. Yoon served as the America Group Leader for KC.

---

[8] https://digitaledition.strategy-business.com/publication/?i=145911&p=70 (last accessed March 14, 2024).

[9] https://www.hyundainews.com/en-us/bios/jose-munoz (last accessed March 14, 2024); https://www.hyundai.news/eu/articles/press-releases/hyundai-motor-appoints-jose-munoz-as-chief-operating-officer.html (last accessed March 14, 2024)

[10] https://www.hyundainews.com/en-us/bios/brian-latouf- (last accessed March 14, 2024); https://www.linkedin.com/in/brian-latouf-b6a8b7b4/ (last accessed March 14, 2024).

[11] https://www.kiamedia.com/us/en/media/pressreleases/13858/seungkyu-sean-yoon-1 (last accessed March 14, 2024); https://www.linkedin.com/in/seungkyu-sean-yoon-3251b1a9/ (last accessed March 14, 2024);

35.    Moreover, HMC and KC have overlapping management. Eui-Sun Chung serves as President of KC, Executive Vice Chairman of HMC, and Chairman of Hyundai Motor Group.[12]

36.    HMC and KC control the public name and brand of HMA and KA, respectively. In consumer transactions, like those with Plaintiffs, HMC's and KC's brands and logos serve as their person and their subsidiaries' official seal and signature to consumers.

## III.  PARTIES

### A. Plaintiffs

37.    Plaintiff Amy Doucette is a resident of Gardner, Massachusetts. Ms. Doucette purchased a new 2020 Kia Niro from Ron Bouchard Kia, located at 488 Old Union Turnpike, Lancaster, MA 01523, in or around April 2020.

38.    Ron Bouchard Kia is part of Kia's network of authorized dealers across the United States, and is promoted on KA's website, which includes an updated list of the dealership's inventory.[13]

39.    Ms. Doucette purchased her Class Vehicle because she believed that the vehicle was safe, reliable, and of the highest quality.  When shopping for her Class Vehicle, Ms. Doucette researched and considered the reliability and quality of the make and manufacturer. Prior to purchasing her Class Vehicle, Ms. Doucette heard, viewed, and/or read Kia marketing materials and advertisements including brochures, commercials, and internet advertisements, which were disseminated from California, that touted the quality, reliability and safety of Kia vehicles.

---

https://www.automotiveworld.com/news-releases/kia-america-debuts-in-us-new-name-replaces-kia-motors-america-as-part-of-kia-corporation-global-brand-strategy/ (last accessed March 14, 2024).

[12] https://worldwide.kia.com/int/company/ir/info/board-of-directors (last accessed March 14, 2024).

[13] https://www.kia.com/us/en/find-a-dealer/result?zipCode=34982 (last accessed March 14, 2024).

40.    At no point before Ms. Doucette purchased her vehicle did Kia disclose that her vehicle suffered from the Defect, which results in the vehicle stalling, unreliable and unsafe performance of the hybrid powertrain, and could cause vehicle fires.

41.    Ms. Doucette did not receive the benefit of her bargain. Ms. Doucette purchased a vehicle that is of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and reliable operation. The Defect has significantly diminished the value of Ms. Doucette's Class Vehicle.

42.    Had Defendants disclosed the Defect, Ms. Doucette would not have purchased her Class Vehicle, or would have paid less to do so.

43.    Ms. Doucette purchased her Class Vehicle and it included the manufacturer's warranty. At all times, Ms. Doucette maintained her vehicle in accordance with Kia's guidance.

44.    Ms. Doucette would purchase a Hyundai or Kia vehicle in the future if Defendants' representations about the vehicle, including its quality, safety, and durability, were accurate.

45.    Ms. Doucette presented her Class Vehicle to Ron Bouchard Kia on January 22, 2024 to receive the "remedy" offered in the 2023 Recall. The Kia dealership installed a "fuse kit" but did not repair or replace the vehicle's ECA which remains susceptible to moisture intrusion and short circuits.

46.    Ms. Doucette's Class Vehicle currently has approximately 43,000 miles. Ms. Doucette is unable to afford to replace her Class Vehicle and therefore is forced to continue driving the dangerous and unreliable vehicle.

47.    Plaintiff Meredith Tongue is a resident of Canton, Georgia. Ms. Tongue purchased a 2019 Hyundai Ioniq from Rick Case Hyundai, located 3180 Satellite Blvd., Duluth, GA 30096, on December 2, 2022.

48.    Rick Case Hyundai is part of Hyundai's network of authorized dealers across the United States, and is promoted on HMA's website, which includes an updated list of the dealership's inventory.[14]

49.    Ms. Tongue purchased her Class Vehicle because she believed that the vehicle was safe, reliable, and of the highest quality.  When shopping for her Class Vehicle, Ms. Tongue researched and considered the reliability and quality of the make and manufacturer. Prior to purchasing her Class Vehicle, Ms. Tongue heard, viewed, and/or read Hyundai marketing materials and advertisements including brochures, commercials, and internet advertisements, which were disseminated from California, that touted the quality, reliability and safety of Hyundai vehicles.

50.    At no point before Ms. Tongue purchased her vehicle did Hyundai disclose that her vehicle suffered from the Defect, which results in vehicle stalling, unreliable and unsafe performance of the hybrid powertrain, and could cause vehicle fires.

51.    Ms. Tongue did not receive the benefit of her bargain. Ms. Tongue purchased a vehicle that is of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and reliable operation. The Defect has significantly diminished the value of Ms. Tongue's Class Vehicle.

52.    Had Defendants disclosed the Defect, Ms. Tongue would not have purchased her Class Vehicle, or would have paid less to do so.

53. When Ms. Tongue purchased her Class Vehicle, it included the manufacturer's hybrid system warranty. At all times, Ms. Tongue maintained her vehicle in accordance with Hyundai's guidance.

54.    Ms. Tongue would purchase a Hyundai or Kia vehicle in the future if Defendants' representations about the vehicle, including its quality, safety, and durability, were accurate.

_____

[14] https://www.hyundaiusa.com/us/en/dealer-locator (last accessed March 14, 2024).

55.    Beginning on or around July 2023, Ms. Tongue's Class Vehicle began to exhibit engine performance issues when trying to accelerate.

56.    Ms. Tongue presented her Class Vehicle to Rick Case Hyundai on August 21 and 23, 2023, when the vehicle had approximately 95,500 miles on the odometer, for multi-point inspections and due to a complaint relating to engine performance when accelerating. The Hyundai dealership did not repair or replace the vehicle's ECA which remains susceptible to moisture intrusion and short circuits.

57.    Ms. Tongue's Class Vehicle had 82,836 miles at the time of purchase and currently has approximately 105,000 miles. Ms. Tongue is unable to afford to replace her Class Vehicle and therefore is forced to continue driving the dangerous and unreliable vehicle.

**B. Defendants**

58.    Defendant KA is a California corporation with its principal place of business in Irvine, California. KA is a subsidiary of KC and is actively engaged in manufacturing, assembling, marketing, and distributing Kia vehicles sold in the United States.

59.    In documents filed with NHTSA related to safety recalls for the Class Vehicles, KA is listed as the manufacturer of the recalled vehicles.[15] Additionally, in KA's recall notices to owners, it instructs Class Vehicle owners to have the repair completed at the "nearest authorized Kia dealership" which can be located by "visit[ing]" KA's website ("www.kia.com"), which is listed on the notice.[16]

60.    KA's C-Suite, executives, and employees responsible for the manufacture, development, distribution, marketing, sales, customer service, and warranty servicing of Kia vehicles are located at the company's Irvine headquarters. As detailed *infra*, the decisions regarding the marketing and sale of the Class Vehicles, the development and

---

[15] *E.g.*, https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V534-5538.PDF (last accessed March 14, 2024).

[16] https://static.nhtsa.gov/odi/rcl/2023/RCONL-23V534-2175.pdf (last accessed March 14, 2024).

issuance of safety recalls, warranty coverage, and decisions regarding the disclosure or non-disclosure of the Defect were in whole or substantial part made by KA at its California headquarters.

61.   Defendant KC is a South Korean corporation with its headquarters located in Seoul, South Korea. KC is the parent corporation of KA.

62.   On its own website, KC promotes Kia branded vehicles sold by KA in the United States.[17]

63.   On information and belief, KA and KC control various details regarding their dealers' operations through various written agreements, such as: (i) granting each dealer a license to use their respective trademarks and intellectual property; (ii) furnishing each dealer with marketing materials to assist in the sale of their vehicles; (iii) providing training to dealership personnel to assist in their sales activities; and (iv) prohibiting their dealers from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Class Vehicles.

64.   Defendant HMA is a California corporation with its principal place of business in Fountain Valley, California. HMA also maintains a 4,300-acre testing facility in Irwindale, California, and an engineering facility in Detroit, Michigan.  HMA is a subsidiary of HMC and is actively engaged in manufacturing, assembling, marketing, and distributing Hyundai vehicles sold in California and the rest of the United States.

65.   HMA's C-Suite, executives, and employees responsible for the manufacture, development, distribution, marketing, sales, customer service, and warranty servicing of Hyundai vehicles are located at the company's Fountain Valley headquarters. As detailed *infra*, the decisions regarding the marketing and sale of the Class Vehicles, the development and issuance of safety recalls, warranty coverage, and decisions regarding the disclosure or non-disclosure of the Defect were in whole or substantial part made by HMA at its California headquarters.

---

[17] *E.g.*, https://worldwide.kia.com/int/niro (last accessed March 14, 2024).

66.     In documents filed with NHTSA related to safety recalls for the Class Vehicles, HMA is listed as the manufacturer of the recalled vehicles.[18] Additionally, in HMA's recall notices to owners, it instructs Class Vehicle owners to visit a "Hyundai dealer" to have the repair completed.[19]

67.     Defendant HMC is a South Korean corporation with its headquarters located in Seoul, South Korea. HMC is the parent corporation of HMA and owns a 33.88% stake in KC.

68.     HMC promotes on its own website all Hyundai vehicles sold by HMA in the United States.[20]

69.     HMC states that it "help[s] [its] overseas subsidiaries, sales corporations, and newly established enterprises in particular to establish the direction of their customer service strategies."[21] HMC further claims to have "established an ICT-based convergence education system in order to bolster the competency of its employees in customer contact channels such as vehicle sales and product CS, and has also conducted knowledge-enhancing training on vehicles (electric vehicles, luxury vehicles) and customer consultation (CRM, CS) skills improvement training in an effort to nurture experts in vehicle sales, customer interaction, and customer service."

70.     On information and belief, HMC and HMA control various details regarding their dealers' operations through various written agreements, such as: (i) granting each dealer a license to use their respective trademarks and intellectual property;

---

[18] *E.g.*, https://static.nhtsa.gov/odi/rcl/2018/RCLRPT-18V260-8471.pdf (last accessed March 14, 2024).

[19] https://static.nhtsa.gov/odi/rcl/2018/RCONL-18V260-6412.pdf (last accessed March 14, 2024).

[20] https://www.hyundai.com/worldwide/en/vehicles (last accessed March 14, 2024).

[21] https://www.hyundai.com/content/dam/hyundai/ww/en/images/company/sustainability/about-sustainability/hmc-2022-sustainability-report-social-en.pdf (last accessed March 14, 2024).

(ii) furnishing each dealer with marketing materials to assist in the sale of their vehicles; (iii) providing training to dealership personnel to assist in their sales activities; and (iv) prohibiting their dealers from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Class Vehicles.

71.    For example, HMC developed a "dealership facility program-known as the 'Global Dealership Space Identity,'" which was implemented by HMA across the United States.[22] With the assistance of a third party, HMA created "a Global Design Space Identity (GDSI) Facility Standards Manual that outlined all of the new requirements for interior and exterior elements that US dealerships would need." HMA also "developed the GDSI Facility Design Services Program—a multi-faceted … program including individual surveys of every dealership, site-specific recommendations, and the installation of all new brand elements." As part of the GDSI Facility Design Services Program, HMA provides "every dealer with a complete design intent document" and each dealership works with the third-party retained by HMA "from start to finish—ending each project with an on-site GDSI Facility Compliance Review to make sure every installation was successful[.]"

## IV.    SUBSTANTIVE ALLEGATIONS[23]

### A. Hyundai and Kia become one of the most popular automakers in the United States by promoting the safety and reliability of their vehicles.

72.    HMC was established in South Korea in 1967 and started selling vehicles in the United States in 1986 through its subsidiary HMA. Since that time, HMC has become one of the largest automakers in the United States and around the world.

---

[22] https://www.agi.net/our-work/a-subsidiary-of-hyundai-motor-company-of-korea-distributes-cars-and-sport-utility-vehicles-throughout-the-united-states (last accessed March 14, 2024).

[23] Emphasis added throughout unless stated otherwise.

73.   KC was founded in 1944 manufacturing bicycles and motorcycles and is Korea's oldest manufacturer of motor vehicles. KA was formed in 1992 when KC first imported its vehicles into the United States.

74.   In 1999, HMC announced that it had acquired a controlling interest in KC, and that KC would obtain an ownership interest in approximately twenty-two (22) HMC subsidiaries. In subsequent years, HMC divested a portion of its interest and currently controls approximately 34% of KC.

75.   Through its network of more than 800 dealerships nationwide, HMA sells and services its vehicles.  Likewise, KA sells and services a complete line of vehicles in the U.S. through its own network of over 700 dealers.

76.   HMA and KA marketed and sold thousands of Class Vehicles nationwide, including through their nationwide network of authorized Hyundai and Kia dealers and service providers. HMA and KA sell their vehicles through their authorized dealerships. After these dealerships sell cars to consumers, including Plaintiffs and Class Members, they acquire additional inventory from Defendants to replace the vehicle sold, increasing Defendants' revenues. Defendants also sell replacement parts to their dealerships for use to service, maintain, and repair vehicles, including the Class Vehicles. Thus, Plaintiffs' and Class Members' purchase of Class Vehicles and their replacement parts accrue to the benefit of Defendants by increasing their revenues.

77.   Collectively, Hyundai and Kia are the world's third-largest automaker.[24] Defendants reported global sales of 7.3 million vehicles in 2023.[25]

_____

[24] https://www.cnbc.com/2024/02/29/how-hyundai-motor-group-became-the-worlds-third-largest-automaker.html (last accessed March 18, 2024).

[25] https://m.pulsenews.co.kr/view.php?year=2024&no=67672#:~:text=Hyundai%20Motor%20and%20Kia%20sold,automaker%20for%20a%20second%20year (last accessed March 18, 2024).

78.    Additionally, a report by McKinsey & Company found that over twice as many second-owner used vehicles are sold in the United States each year compared to new vehicles.[26]

79.    Defendants have been able to transform themselves into such large players in the U.S. auto-market based on its assurances to consumers of care and quality. For example, HMC touts itself as being "committed to becoming a lifetime partner in automobiles and beyond[.]"[27]

80.    On HMC's webpage devoted to promoting its vehicles sold around the world, including those sold by HMA, HMC touts the safety of its vehicles.[28] HMC states that "[a]t the core of IONIQ Hybrid's design focus is class-leading safety and stability engineered to take any road with comfort and ease."[29]

81.    In HMA's public statements, it poses a question: "What if [a car company] cracked the entire industry wide open, peered more deeply into it, spread out all its parts, and questioned their every detail? ... At Hyundai, we ask ourselves the important questions every day. And, every day, we seek the best answers. It's what makes us grow as a car company. It's what makes us Hyundai."[30]

82.    Likewise, KA advertises that "Kia engineers are passionate about producing vehicles that are ***exceptionally well designed and reliable***. Their dedication to quality

---

[26] https://www.mckinsey.com/industries/automotive-and-assembly/our-insights/used-cars-new-platforms-accelerating-sales-in-a-digitally-disrupted-market# (last accessed March 18, 2024).

[27] https://www.hyundainews.com/en-us/releases/2654 (last accessed March 18, 2024).

[28] *E.g.*, https://www.hyundai.com/worldwide/en/eco/ioniq-hybrid/safety (last accessed (last accessed March 18, 2024).

[29] https://www.hyundai.com/worldwide/en/eco/ioniq-hybrid/safety (last accessed (last accessed March 18, 2024).

[30] https://www.hyundainews.com/en-us/releases/1191 (last accessed (last accessed March 18, 2024).

CLASS ACTION COMPLAINT

and attention to detail give Kia the confidence to back every model with an industry-leading warranty program."[31]

83.   When marketing the Class Vehicles, KA states in its 2019 Niro brochure that "SAFETY never takes a day off" and "[a]t Kia, the priority is always on improving all aspects of safety." [32]

84.   HMA's and KA's marketing brochures for Class Vehicles specifically tout the quality, performance, reliability, and benefits of their hybrid systems.

85.   HMA states in its 2019 Hyundai Ioniq Hybrid brochure, "If you're thinking about driving a car designed to reduce emissions and save fuel, your timing is excellent… Each [Ioniq] delivers outstanding fuel economy. Ioniq Hybrid Blue is rated by the EPA as the most fuel-efficient non-plug-in car in America."[33] HMA adds that "The Ioniq's low-emission powertrains and eco-friendly exterior paints help address the Earth's climate."

86.   Not only does HMA tout the hybrid system's purported fuel-efficient features, it specifically promotes its powertrain performance, stating: "Behind the wheel of an Ioniq Hybrid or Plug-in Hybrid, the shifts of a 6-speed Dual Clutch Transmission are crisp, without the strange rubber-band sensation you feel with some other hybrids' continuously variable transmissions. Press the brake pedal, and the response is reassuringly direct (unlike the squishy pedal feel of many other hybrids). There are no odd noises from the electric motor, either. Instead, you feel the electric motor's seamless

---

[31] https://manualzz.com/doc/7136122/kia-2015-sorento-brochure---dealer-e (last accessed March 18, 2024).

[32] https://www.auto-brochures.com/makes/Kia/Niro/Kia_US%20Niro_Hybrid_2019.pdf (last accessed March 14, 2024).

[33] https://www.auto-brochures.com/makes/Hyundai/Ioniq/Hyundai_US%20Ioniq_2019.pdf (last accessed March 24, 2024).

CLASS ACTION COMPLAINT

torque propelling you forward, with the grip of a multi-link rear suspension holding the road. And that just feels right."[34]

87.    Moreover, HMA specifically markets the ability to rely on solely on the ICE for greater performance: "Drive Mode Select's Sport mode keeps Ioniq Hybrid and Plug-in Hybrid's gas-powered engine on at all times, using the electric motor to power added traction. It firms up steering, quickens the shift points and changes the color of the gauges to enhance the sense of sportiness."[35] HMA also provided the following graphic showing that the ICE is required for acceleration and uphill driving regardless of driving mode selected:

88.    In a press release discussing the 2019 Ioniq, HMA stated "POWERTRAIN



CHOICE[:] Developed for high energy efficiency *without compromising* driving performance, every Ioniq powertrain represents a unique and ***uncompromising solution*** toward a cleaner means of mobility."[36]

---

[34] https://www.auto-brochures.com/makes/Hyundai/Ioniq/Hyundai_US%20Ioniq_2019.pdf (last accessed March 14, 2024).
[35] https://www.auto-brochures.com/makes/Hyundai/Ioniq/Hyundai_US%20Ioniq_2019.pdf
[36] https://www.hyundainews.com/en-us/releases/2542 (last accessed March 14, 2024).

CLASS ACTION COMPLAINT

89.    In a press release published by HMA announcing the release of 2017 Ioniq Class Vehicles, Mike O'Brien, vice president of Corporate, Product and Digital Planning for HMA stated that the:

> "IONIQ will attract an entirely new group of eco- and efficiency-oriented buyers in the U.S. market… With outstanding **powertrain flexibility**, design, connectivity, and advanced technologies, IONIQ meets the needs of a large and growing group of buyers needing a highly efficient, low-emissions vehicle **without compromise** to their daily lifestyles."[37] In a different press release discussing the 2017 Ioniq, HMA reiterated that "Hyundai's approach for the Ioniq line delivers an uncompromising design and driving experience **coupled with the latest in safety** and convenience technologies, making it an appealing choice for a wide range of buyers."[38]

90.    Likewise, the Niro's hybrid engine plays a prominent role in the marketing of the vehicle. KA's brochure for 2017 Niro tells consumers they can get "the best of both worlds," that "[t]he new Kia Niro is a game-changing hybrid crossover that proves you really can have it all."[39] KA touts the environmentally friendly aspects of the hybrid engine as well, calling the vehicle "[a] sustainable, fuel-efficient hybrid, with the style, technology and versatility of a crossover. It's the ultimate choice for those who care about the environment – and care just as much about driving pleasure."

91.    In its brochure for the 2019 Kia Niro Hybrid (HEV) and PHEV, KA specifically promotes the use of the vehicles' ICE and electric motors: "Niro HEV's advanced parallel hybrid powertrain **seamlessly blends gas and electric power for a great ride with outstanding hybrid efficiency** — such as a combined EPA-estimated average of 50 mpg on the FE trim. It's just as impressive on the inside, too — giving you

---

[37] https://www.hyundainews.com/en-us/releases/2308 (last accessed March 14, 2024).

[38] https://www.hyundainews.com/en-us/releases/2322 (last accessed March 14, 2024).

[39] https://www.auto-brochures.com/makes/Kia/Niro/Kia_int%20Niro_2017.pdf

state-of-the-art connectivity, tons of crossover versatility, and a range of intuitive technology and available premium features."[40] As for the 2019 Niro PHEV, KA claims that the vehicle includes "hybrid technology at the next level" and that the vehicle "gives you the same crossover perks as HEV, plus lets you plug in, charge up, and go fully electric at the push of a button — an EPA-estimated 26 miles on a full charge."[41]

92.    KA further promotes the hybrid features of the 2019 Kia Niro HEV and PHEV, stating "POWER & EFFICIENCY come courtesy of Niro's 1.6L Gasoline Direct Injection (GDI) engine and powerful electric motor, which together deliver 139 horsepower and outstanding efficiency."[42]

93.    Moreover, KA specifically discusses the vehicle's dual powertrains (ICE and electric): "Niro HEV is designed to allow both the gasoline engine and electric motor to **work together simultaneously** for optimum efficiency."[43] KA further touts the reliability of the PHEV system: "Head out for the day, charge up when you get home, and rest assured that should you exceed your all-electric range, PHEV will kick into hybrid mode automatically. So you won't have to plug in and recharge until it's convenient for you."

94.    KA's 2019 Niro brochure states: "HEV and PHEV are powered by Kia's full parallel hybrid system. This advanced engineering allows both the gas engine and electric motor to **simultaneously** provide power directly to the wheels, for optimum efficiency. PHEV takes this technology a step further, letting you go all electric, on demand." [44]

---

[40] https://www.auto-brochures.com/makes/Kia/Niro/Kia_US%20Niro_Hybrid_2019.pdf (last accessed March 14, 2024).

[41] *Id*.

[42] *Id*.

[43] *Id*.

[44] *Id*.

CLASS ACTION COMPLAINT

95.    Similarly, KA's 2020 brochure for the 2019 Kia Niro Hybrid (HEV) and PHEV promotes hybrid powertrains by stating that "Niro gives you two ways to get crossover versatility with hybrid efficiency. Niro Hybrid (HEV) blends gas and electric power, while Niro Plug-In Hybrid (PHEV) does the same,… No matter which you choose, you'll also get impressive technology."[45] Moreover, KA recognized that consumers are reluctant to rely on electric power alone and ICE performance is critical, telling consumers "[y]ou'll be happy to learn that you can take those road trips just like you always have. The desert, the coast, new cities, old favorites... the Niro hybrids give you impressive range to roam."

96.    KA tells consumers on its website that they can "[s]pend less on maintenance with an EV[,]" and asks "Did you know that electric vehicles generally require less

_____

[45] https://www.auto-brochures.com/makes/Kia/Niro/Kia_US%20Niro_Hybrid_2020.pdf (last accessed March 14, 2024).

factory recommended maintenance than traditional gas engine vehicles? See how an EV and a gas engine vehicle differ when it comes to a typical maintenance schedule."[46]

**B. Hyundai and Kia vehicles have the same designs, components, and suppliers.**

97. Today, over half the cars HMC sells in the United States are designed and manufactured domestically at HMA's facilities, including at its "design, research, and testing grounds in California" near its corporate headquarters.[47] In total, HMC and HMA employ approximately 5,000 people at these facilities, and an additional 20,000 employees at U.S. dealerships. Similarly, more than 40 percent of Kia vehicles sold in the United States are manufactured in the country.[48] KC has invested $2.8 billion in a manufacturing facility located in Georgia.[49] By 2025, Kia will have produced 5 million vehicles in the United States.[50]

98. Hyundai and Kia branded vehicles share many of the same components, including the ECAs installed in the Class Vehicles (*see infra* ¶¶ 119-22), and the same group of engineers work on Hyundai and Kia vehicles at Hyundai-KA Technical Center, Inc. ("HATCI").[51]

---

[46] https://www.kia.com/us/en/ev (last accessed March 14, 2024).

[47] https://www.hyundainews.com/assets/documents/original/19525-AboutHyundaiMotorAmerica.pdf (last accessed March 14, 2024).

[48] https://www.georgia.org/press-release/kia-invest-over-200-million-ev9-production-expansion (last accessed March 14, 2024).

[49] https://www.kiageorgia.com/about-kia-georgia/the-plant/ (last accessed March 14, 2024).

[50] https://www.wtvm.com/2024/02/20/kia-approaching-5-million-mark-vehicle-production-west-point/ (last accessed March 14, 2024).

[51] https://www.forbes.com/sites/jimhenry/2013/05/31/balancing-act-hyundai-and-kia-share-products-under-the-skin-but-must-avoid-blurring-identities/?sh=210585421c7a (last accessed March 14, 2024); https://www.hyundainews.com/en-us/releases/398 (last accessed July 14, 2021); https://www.prnewswire.com/news-releases/new-report-highlights-hyundais-multi-billion-dollar-contribution-to-the-united-states-economy-301926034.html (last accessed March 14, 2024).

99.   Hyundai and Kia vehicles are commonly rebranded or "rebadged" versions of the other brand's vehicles. For example, the Hyundai Entourage "is identical to the [Kia] Sedona, except for cosmetics and the packaging of a few features."[52] The engines are the same in these vehicles, the climate controls are placed in the same locations, even the number of cupholders (14) are identical.

100.  Introduced by Defendants with their 2017 model year, the Hyundai Ioniq and Kia Niro Class Vehicles are based on the same design platform.

101.  A recent *Consumer Reports* article highlighted the fact that "[a]lthough Hyundai and Kia are separate brands, the Hyundai Motor Company is the largest shareholder in Kia Motors, with 33.88 percent ownership" and the "brands share many of the same parts from the same suppliers, including some of the parts at risk of catching fire."[53]

102.  Because Hyundai and Kia vehicles are often rebadged vehicles, they frequently use identical and interchangeable parts. That is why when Hyundai announces a recall of its vehicles, an identical Kia recall is typically announced shortly thereafter, or vice versa. For example, in 2013, Hyundai and Kia recalled 1.7 million vehicles across thirteen models which shared the same defective brake light switches.[54] The *Los Angeles Times* noted that the "massive recall of 1.7 million vehicles … was a sign of what can go wrong when parts are shared by" Hyundai and Kia.

**C. Engine Clutch Actuators are necessary for the safe and reliable operation of the hybrid Class Vehicles**

103.  Since they were first brought to market, hybrid vehicles were marketed as a technological advancement that provides environmental benefits, including air quality,

---

[52] https://www.nytimes.com/2006/11/12/automobiles/autoreviews/12AUTO.html (last accessed March 14, 2024).

[53] https://www.consumerreports.org/cars/car-recalls-defects/why-so-many-hyundai-kia-vehicles-get-recalled-for-fire-risk-a1169940635/ (last accessed March 14, 2024).

[54] https://www.latimes.com/business/la-xpm-2013-apr-03-la-fi-hy-hyundai-kia-motors-recall-20130403-story.html (last accessed March 14, 2024).

to drivers and the public at large. Hybrid vehicles "typically produce lower tailpipe emissions than conventional vehicles do, and zero tailpipe emissions when running only on electricity."[55] Hybrid vehicles, when performing as designed, offer meaningful cost savings to drivers as the cost of electricity is significantly less than the cost of gasoline.[56] As shown above, these benefits play prominent roles in the marketing for the Class Vehicles.

104. The Class Vehicles are hybrid vehicles that contain Defendants' 1.6-liter four-cylinder engine and an electric motor.  Defendants manufacture and sell two forms of hybrid Class Vehicles, traditional hybrid electric vehicles ("HEV") and plug-in hybrid electric vehicles ("PHEV").

105. The drivetrain systems for HEV and PHEV Class Vehicles are identical except that HEV vehicles do not have a plug to charge its battery.[57]  While an HEV regenerates energy using the ICE or with the help of regenerating braking,[58] a PHEV has the additional option of charging its battery from an electric outlet.[59]

---

[55] https://afdc.energy.gov/vehicles/electric_emissions.html (last accessed March 14, 2024).

[56] https://www.forbes.com/sites/brookecrothers/2021/05/22/rising-gas-prices-driving-you-to-an-electric-car-cost-to-charge-a-tesla-model-3-vs-gas/?sh=3e12b2c37192 (last accessed March 14, 2024).

[57] https://www.kia.com/eu/about-kia/experience-kia/technology/electrification/how-do-hybrid-electric-cars-work/ (last accessed March 14, 2024).

[58]

"Regenerative brakes use electric motors rather than a traditional friction braking system to slow down and stop a car… With regenerative brakes, the braking system captures that kinetic energy and transfers it into the car's batteries." https://www.energy.gov/energysaver/how-regenerative-brakes-work#:~:text=Regenerative%20brakes%20work%20by%20reversing,over%20time%20when%20used%20regularly (last accessed March 14, 2024).

[59] 2020 Niro HEV and PHEV Owner's Manual p. H3, available at https://owners.kia.com/content/owners/en/manuals.html (last accessed March 14, 2024).

106.  Hybrid vehicles have two sources of propulsion (i.e. horsepower and torque): an ICE and an electric motor—as opposed to a single powertrain found in traditional gas-fueled ICE vehicles. When driven, hybrid vehicles can utilize the ICE, the electric motor, or both. Incorporation of the electric motor, or its complete replacement of an ICE for power, can minimize fuel consumption, conserve energy, and in certain cases, recuperate energy in some driving situations (e.g. starting, cruising, braking, stopping, etc.).

107.  A hybrid vehicle is designed to be "able to switch between both powertrains or make them work together to always deliver the solution that powers the car forward with maximum efficiency. This changes all the time, at different points in the driving process."[60] "Depending on the driving conditions, the HEV computer selectively operates between the engine and the electric motor or even both at the same time."[61]

108.  "The [electric] drive motor supplements the [ICE] power when the driver press[es] the accelerator pedal or when the vehicle is running in the fuel efficiency mode. In addition, the drive motor plays the role of an alternator (generator) when decelerating or braking to charge the high-voltage battery."[62]

109.  Kia explains in its Owner's Manuals for the Kia Class Vehicles that when a HEV starts up or is cruising at a low speed, it utilizes the electric motor.[63] But acceleration of the Class Vehicle *requires* usage of the ICE.

---

[60] https://www.kia.com/eu/about-kia/experience-kia/technology/electrification/how-do-hybrid-electric-cars-work/ (last accessed March 14, 2024).

[61] 2020 Niro HEV and PHEV Owner's Manual p. H2.

[62] https://www.hioniqae.com/hyundai_ioniq_description_and_operation-839.html (last accessed March 14, 2024).

[63] 2020 Niro HEV and PHEV Owner's Manual p. H2, available at https://www.kiatechinfo.com/ext_If/kma_owner_portal/content_pop.aspx.



110. HMA's 2020 Ioniq Owner's manual contains the same description of the hybrid system and graphic:[64]



111. The PHEV Class Vehicles contain an "Electric Vehicle Mode," also called "CD (Charge Depleting) Mode," which could allow drivers to accelerate using the electric motor. However, this mode can only be used "over a certain distance until the hybrid battery becomes low" and certain driving conditions or use of interior features, such as a heater, may require use of the ICE, even when the vehicle is in Electric Vehicle Mode.[65]

---

[64] https://cdn.dealereprocess.org/cdn/servicemanuals/hyundai/2020-ioniqhybrid.pdf, H2. (last accessed March 14, 2024).

[65] 2020 Niro HEV and PHEV Owner's Manual p. H3.

112. Like a traditional gas-powered vehicle, the hybrid Class Vehicles transfer mechanical power from the ICE and/or electric motor to the transmission to drive the wheels.[66] The Class Vehicles are equipped with an automatic six-speed dual-clutch transmission ("DCT").

113. Transmissions are comprised of a series of gears that allow the driver to control how much power is delivered from a power source (ICE or electrical motor) to the vehicle's wheels. Transmissions are also necessary to properly maintain an ICE. Without a transmission, an ICE would spin too quickly, resulting in structural instability, engine shaking, and overheating.

114. In addition to the transmission clutch system that is common to all vehicles, the Class Vehicles contain an engine clutch system.[67] Generally, a clutch is a mechanical disk that engages and disengages a power source from a rotating shaft. For Class Vehicles, the engine clutch system controls when a Class Vehicle's DCT is powered by the ICE, electric motor, or both. According to KA and HMA, the engine clutch system

---

[66] https://afdc.energy.gov/vehicles/how-do-hybrid-electric-cars-work; https://www.hioniqae.com/hyundai_ioniq_description_and_operation-839.html (last accessed March 14, 2024).

[67] https://www.hioniqae.com/hyundai_ioniq_description_and_operation-760.html (last accessed March 18, 2024).; https://www.kniro.net/description_and_operation-1161.html (last accessed March 18, 2024).

"[t]ransmits or blocks the driving power of the engine when switching between the EV and HEV modes."[68]

115.  Below is a diagram showing the power flow from the ICE or electric motor in a Class Vehicle, showing that the engine clutch sits between the ICE: [69]



116.  The engine clutch system found in the Class Vehicles contains several parts, including the clutch disc, the ECA, a fluid reservoir and a hydraulic pipe:[70]

---

[68] https://www.hioniqae.com/hyundai_ioniq_description_and_operation-760.html; https://www.kniro.net/description_and_operation-1161.html (last accessed March 18, 2024).

[69]https://www.hioniqae.com/hyundai_ioniq_description_and_operation-839.html (last accessed March 18, 2024).

[70] https://www.hioniqae.com/hyundai_ioniq_description_and_operation-760.html (last accessed March 18, 2024); https://www.kniro.net/description_and_operation-1161.html (last accessed March 18, 2024).

117. The central component of the engine clutch system—and thus, the entire hybrid vehicle—is the ECA. As its name states, the ECA actuates or causes the engine clutch to connect or disengage the ICE from the transmission. The ECA is controlled hydraulically using brake fluid, which is why it is also referred to as the Hydraulic Clutch Actuator.

118. The ECA contains a PCB that is used to receive and translate the electric operating signal that dictates whether the ICE should be engaged.[71] And the PCB is powered by the vehicle's 12V battery.

119. The ECAs in each of the Class Vehicles contain the same design and are interchangeable. Specifically, the Class Vehicles' ECAs are manufactured by Schaeffler Automotive Buehl GmbH & Co. KG ("Schaeffler"), formerly known as LuK GmbH & Co. KG ("Luk").

120. The ECAs are manufactured by Schaeffler based on HMC and KC's specifications. When Schaeffler filed a Defect Information Report relating to the ECAs

---

[71] "A printed circuit board (PCB) is an electronic assembly that uses copper conductors to create electrical connections between components. PCBs also provide mechanical support for electronic components so that a device can be mounted in an enclosure." https://resources.altium.com/p/what-is-a-pcb (last accessed March 18, 2024).

CLASS ACTION COMPLAINT

installed in 2017 Niro and 2017 Ioniq Class Vehicles (*see infra* §IV.E.3), it noted that it "strictly supplies according to the customers' requests."[72]

121. The ECAs in the Class Vehicles are marked by Defendants with parts numbers: 41050-2B001 (2017 Kia Niro and 2017-2019 Hyundai Ioniq); 41050-2B002 (2017-2018 Kia Niro and 2017-2019 Hyundai Ioniq); and 41050-2B003 (2019-2022 Kia Niro and 2017-2022 Hyundai Ioniq). Schaeffler utilizes part number L-0G4D3-0G13 for the Class Vehicle ECAs.[73]

122. The ECAs installed in the Class Vehicles are interchangeable between Hyundai and Kia Class Vehicles. Indeed, as shown below, the packaging for the ECAs and the components themselves bear the logo of both Hyundai and Kia.

[74]



[75]

<hr>

[72] https://static.nhtsa.gov/odi/rcl/2018/RCLRPT-18E033-5664.PDF (last accessed March 18, 2024).

[73] https://static.nhtsa.gov/odi/rcl/2018/RCLRPT-18E033-5664.PDF (last accessed March 18, 2024).

[74] https://www.ebay.com/itm/335168437547 (last accessed March 18, 2024).

[75] https://lagabasen.com/visa-produkt?part=Y-41866621 (last accessed March 18, 2024).

76

**D. The ECAs installed in the Class Vehicles contain a defect that results in engine stalls and vehicle fires.**

123.  Despite Defendants' consistent marketing and repeated promises of safety and reliability of the hybrid engine system, the Class Vehicles contain a defect that poses a dangerous risk to the safety of drivers, passengers, and bystanders. Specifically, the ECAs installed in the Class Vehicles are defective because fluid may enter the PCB located inside the actuator. Fluid within an electrified PCB is a well-known cause of short circuits. In turn, short circuits within a vehicle lead to a host of safety risks, including a spontaneous vehicle fire, that render the vehicle unfit for ordinary usage and dangerous.

124.  In addition to vehicle fires, the Defect causes serious disruptions to the normal functioning of the Class Vehicles and can prevent drivers from starting their vehicle, prevent a driver from safely accelerating or switching between electric and ICE power as needed, or cause the vehicle to stall while in motion.

125.  While some symptoms of the Defect may be apparent to ordinary drivers (e.g., vehicle fires or stalls), not all are. The Defect may also trigger certain Diagnostic Trouble Codes ("DTC"), which are codes used to diagnose malfunctions in a vehicle. While dashboard lights may alert a driver that there is an issue, a DTC identifies what

---

[76] https://www.ebay.com/itm/185794500594 (last accessed March 18, 2024).

and where the issue is. DTCs are also called engine vehicle fault codes and can typically only be read with a scanner that plugs directly into the port of a vehicle. According to KA, the Defect may cause: (i) loss of communication network between ECA and the hybrid control unit (DTC: U1010); (ii) short circuit or high voltage detected within vehicle control modules (DTC: U1011); (iii) a functional safety fault in the engine clutch system (DTC: P17EE); (iv) a fault in the (End of Line) coding for the engine clutch system (DTC: P17ED); (v) abnormal performance of the engine clutch system (DTC: P17E8); (vi) fault in the engine clutch actuator electric hardware (DTC: P17E2); and (vii) a fault with the engine clutch system generating energy for the transmission (DTC: P1744).[77]

126.  One owner of a 2022 Kia Niro filed a complaint with NHTSA regarding his experience with the Defect, stating: "[W]hile driving at an undisclosed speed, the vehicle inadvertently lost motive power. The [driver] was able to pull over to the shoulder of the roadway, where the vehicle failed to restart. The check engine and Hybrid System warning lights illuminated. The vehicle was towed to the dealer, who diagnosed a failure with the hydraulic clutch actuator."[78]

127.  An owner of a 2019 Kia Niro reported to NHTSA that "[W]hile traveling on the freeway the gas engine shut down, HEV triangle came on and the information center on the car displayed 'turn off car restart' on this trip it happened three times… When this happens, I have only a limited amount of room to get the car off the road. This problem has only happened on freeways and the mountain pass with limited pull outs. This exposes me and any passenger's to a rear end collision. I feel the manufacture is playing [sic] roullet with me and my passenger's lives."[79]

---

[77] https://static.nhtsa.gov/odi/rcl/2023/RCRIT-23V534-0846.pdf (last accessed March 18, 2024).
[78] NHTSA ID Number: 11558404.
[79] NHTSA ID Number: 11559989.

128.  An owner of a 2018 Niro filed a complaint with NHTSA, warning that "while driving at an undisclosed speed, the engine revved up. The contact stated that the accelerator pedal was depressed; however, the vehicle was slow to respond. Eventually, the vehicle shifted into gear and started to move. The contact stated that the check HEV and turn off engine error messages were displayed. The vehicle was taken to the local dealer, where it was diagnosed that a faulty engine clutch [sic] activator needed to be replaced."[80]

129. The owner of a 2017 Niro filed a NHTSA complaint because the vehicle "caught on fire…[while] driving down the interstate. No coll[i]sion was involved."[81] The owner went on to describe the cascading safety risks created by the Defect: "I got a warning message to stop the engine due to a problem being detected in the hybrid system. I pulled off of the interstate during rush hour traffic and noticed black smoke coming from underneath my hood. I thought that something had just happened to the engine. I stayed in the car and called a tow truck as I did not want to stand on the shoulder of this busy highway. A man then jumps out of his truck and starts running toward me yelling at me to get out of the car that it was on fire. I got out, we ran down the shoulder and we stood watching my car become engulfed in flames. I just bought the car…." [82]

**E. Defendants knowingly manufactured and sold over one hundred thousand Class Vehicles that contain a deadly defect.**

130.  The ECAs installed in the Class Vehicles contain a safety defect that results in vehicle stalls, unresponsive acceleration, the inability to switch between electric and ICE power in a hybrid vehicle, and engine compartment fires.

131.  Defendants must have had or should of had knowledge of the ECA defect, and the safety risk it poses to Class Vehicle drivers, passengers, and even bystanders, through several sources, including, but not limited to: (1) each Defendant's pre-sale

---

[80] NHTSA ID Number: 11548358.
[81] NHTSA ID Number: 11191530.
[82] *Id.*

testing; (2) each Defendant's own records of customer complaints; (3) dealership repair records; (4) warranty and post-warranty claims and part sales; (5) three safety recalls issued in 2018 concerning the ECAs installed in certain Class Vehicles; and (6) Hyundai and Kia's long history of defective components causing electrical short circuits in their vehicles and each Defendant's post sale monitoring of Class Vehicles for safety defects.

## 1. Defendants' Pre-Sale Testing and Quality Control Measures

132. HMC, HMA, KA, and KC are experienced in the design and manufacture of consumer vehicles. As experienced manufacturers, Defendants conduct rigorous pre-sale tests to verify the parts are free from defects and align with their specifications.

133. HMC states that it conducts "preemptive quality and safety measures from the vehicle development stage" and is able to "prevent[] any significant problems afterward through early detection, early improvement and early after-sales actions."[83] To that end, HMC touts its continued improvement of quality and safety measures and how it conducts extensive post-sale monitoring of its vehicles:[84]

> *[W]e continue upgrading overall quality and safety systems not only by promoting preemptive quality and safety measures from the vehicle development stage, but also by preventing any significant problems afterward through early detection, early improvement and early after-sales actions*. In particular, we will establish a sustainable safety management system designed to maximize customer satisfaction and strengthen trust by developing quality and safety training programs, operating quality and safety reporting centers, analyzing safety information, and establishing safety test sites.

---

[83] https://www.hyundai.com/content/dam/hyundai/ww/en/images/company/sustainability/about-sustainability/hmc-2022-sustainability-report-social-en.pdf (last accessed March 18, 2024).

[84] *Id*.

134. HMC further states that it "constantly monitors customer complaints and voluntarily recalls all the relevant vehicles to protect customers as soon as manufacturing defects assessed as highly likely to cause accidents are identified."[85]

135. When announcing the opening of Hyundai and Kia's joint-testing facility in California, known as the "Proving Grounds," HMC stated the facility was designed as a "test site for the next-generation Hyundai and Kia vehicles," "reaffirm[ing] the compan[ies'] commitment to designing, testing, and building Hyundai [and Kia] products in the United States for North American consumers."[86] "[E]very Single Kia [and Hyundai] component" is tested here which is intended to simulate up to "five years' wear and tear."[87] The manager for the facility "describes this extreme test facility as 'a car's worst nightmare.'"[88]

136. KC conducts expansive presale testing on its vehicles to make sure they "endure over a long time without fault."[89] KC states that it conducts "performance and durability tests" on "all Kia vehicles sold in the U.S" at the California Proving Ground.[90] KC further claims that it "put[s] [its] engines through rigorous testing in the highest, hottest and coldest places that a car can possibly be before [it] use[s] them in [Kia] cars."[91]

---

[85] *Id.*

[86] https://www.hyundainews.com/en-us/releases/393 (last accessed March 18, 2024).

[87] https://www.autocar.co.uk/car-news/new-cars/behind-scenes-kias-desert-testing-facility (last accessed March 18, 2024).

[88] *Id.*

[89] https://www.kia.com/fj/experience/innovation-story/performance.Kappa.html (last accessed March 18, 2024).

[90] KC 2017 Annual Report, p.58, *available at* https://worldwide.kia.com/int/company/ir/archive/annual-report (last accessed March 18, 2024).

[91] https://www.kia.com/fj/experience/innovation-story/performance.Kappa.html (last accessed March 18, 2024).

137.  In addition, John Juriga, the Director of Powertrain at HATCI in 2015, stated that Kia's validation testing is among the toughest in the automotive industry.[92] Among other things, this validation testing is intended to ensure durability, during which "we're stressing the components as much as possible and we run it virtually nonstop for 300 hours." Next, Kia does an "overrun spec" where it runs it over spec for 10–20 hours to make sure it can survive past the red line limits in order to "make sure that these products stay durable in the customers' hands."

138.  On its website, KC states that it conducts seven "durability tests" to "identify causes and find solutions to them to make our cars endure over a long time without fault."[93] Among the durability tests performed are two different "parts durability test[s]" ("item durability test" and "module durability test") and a "corrosion test."[94]

139.  HMC and HMA similarly conduct extensive safety testing on their vehicles. Like Kia, HMA touts that its cars are tested in order to ensure that the cars are roadworthy. In its brochure for 2019 Ioniq Class Vehicles, HMA stated that in November 2016, "pressure-test[ed]" the Ioniq prototype "by pushing it to the limits."[95] HMA commented that "[i]t's the kind of achievement under extreme stress that helps validate the durability of engineering like the quick-shifting Dual Clutch Transmission on Ioniq Hybrid and Plug-in Hybrid."[96]

140.  HMC stated that its "***cars undergo thousands of hours of examination and it's not just engine performance that is under scrutiny***."[97]

---

[92] https://www.youtube.com/watch?v=GNPB3RtHN2M (last accessed March 18, 2024).

[93] https://www.kia.com/fj/experience/innovation-story/performance.Kappa.html (last accessed March 18, 2024).

[94] *Id*.

[95] https://www.auto-brochures.com/makes/Hyundai/Ioniq/Hyundai_US%20Ioniq_2019.pdf (last accessed March 18, 2024).

[96] *Id*.

[97] https://www.hyundai.news/eu/articles/press-releases/hail-rain-or-shine-hyundai-motors-extreme-weather-testing.html (last accessed March 18, 2024).

37

141. HMC touts its robust Product Quality Management systems, "based on its quality philosophy of 'producing defect-free vehicles that will never break down' backed by cutting-edge safety technologies:"[98]

**Establishing Quality Management System** Hyundai seeks to create "customer safety" values by securing leading quality standards in the global market and strengthening quality management through technical preventive quality activities, among other initiatives. We have established a company-wide integrated quality management system to satisfy customers' diverse quality and safety requirements, …..

**Quality Management Standards and Techniques** Hyundai has introduced and applied quality management techniques to strengthen its market competitiveness on the basis of "defect-free quality". Our quality management techniques, aimed at providing customers with vehicles of the very highest quality in all fields, such as R&D, production, sales, and services, are supported by the best experts in each field (Man); optimal equipment (Machine); the best parts (Material); the best method (Method); thorough verification (Measurement); and commitment to defect free quality (Moral). ….. We also make continuous efforts to upgrade quality management standards and criteria based on the data collected and analyzed in quality risk management processes, such as quality checks, case studies, and improvements.

**Preemptive Management of Quality Risks** From the early design stage of new vehicle development, Hyundai preemptively inspects and manages parts suppliers as well as its own production process quality. Based on product drawings, we conduct a comprehensive review of parts in terms of functions, structures, reliability, and durability, while carefully analyzing our own processes and those of suppliers before issuing the final approval, thereby eliminating quality risks throughout production processes in advance. In addition to our own verification of test vehicles, Hyundai relies on the test drive opinions of customers and professional quality organizations to identify major issues and carry out improvement activities in parallel. ***Moreover, Hyundai holds quality inspection meetings on regular basis, and in***

---

[98] https://www.hyundai.com/content/dam/hyundai/ww/en/images/company/sustainability/about-sustainability/hmc-2022-sustainability-report-social-en.pdf (last accessed March 18, 2024).

*particular, on the verge of new car models' mass production, reports the quality risk assessment results and taken measures to the highest level of management.*

**Quality Risk Assessment – Identification and Improvement** Hyundai has established a control tower devoted to the management of vehicle quality risks in the production process. *Whenever a quality risk is detected from information acquired through statistical process control, periodic inspections, and shipment pass rates, the control tower takes the lead in conducting joint investigations and taking the necessary countermeasures.* Also, in order to prevent quality risks from occurring in the vehicle production process, we take thorough preventive measures, such as process management by suppliers, assessment of quality prevention activities, validation of quality inspection equipment, and reliability testing of parts.

**Quality Mindset Campaign** Hyundai is carrying out the "Quality Mindset Campaign" with the purpose of spreading a quality culture throughout its entire car development, production *and sales processes*, while its employees internalize the quality first mindset. *The campaign serves as an opportunity for the company to listen directly to voice of customers (VOCs)* on quality issues through various initiatives including "Customers' Quality Diagnosis and Employees' Input", "Meetings between Customers and Employees", and "On-site Meetings between Customers and Production Quality Officers." Based on the VOC, Hyundai is conducting the New Vehicle Quality Assurance Program, among others, as a way to deliver products of perfect quality to its customers. We will continue to promote various quality improvement activities by promoting close communication with customers and their active participation.

**Strengthening Quality Verification Capabilities** Hyundai provides annual training on the roles and major tasks involved in securing its pre-manufacturing quality, manufacturing quality, and *market quality as a way to strengthen the verification capability of its overall quality value chain*. To maximize the effectiveness of verification through enhanced verification capacity, each course includes not only basic theoretical education but also practical and experience-oriented education if necessary. In addition, we offer expert courses on quality verification in collaboration with external educational institutions to verify new technologies following the transition to electrification and to strengthen the verification of quality issues from the customer's point of view.

CLASS ACTION COMPLAINT

**Quality Assurance and Management** Hyundai strives to enhance its quality assurance and management for the safety and protection of customers ***after product sales*** as well as quality management from vehicle development to production, thereby ensuring safety of customers and happiness of their families. In addition, we take quality improvement measures aimed at boosting customer satisfaction by identifying customers' specific complaints, while continuously reinforcing maintainability by evaluating the consistency of maintenance services and improving diagnosis methods, among others.

**Warranty Period for Free Repairs** Hyundai applies the free repair warranty period in consideration of the average life cycle, durability, and sustainability of each type of vehicle, such as passenger cars, SUVs, and commercial vehicles (trucks and buses). Recently, it has introduced a service that allows customers to select the warranty period according to their own driving patterns and habits. In particular, we maximize the sustainability of eco-friendly vehicles by extending the warranty period for the engine and power transmission parts of hybrids, EVs and hydrogen EVs. We are also contributing to minimizing air pollutant emissions with guarantees for catalyst devices, electric control devices, and other exhaust gas parts of older high-emitting models.

**Voluntary Recall** ***Hyundai constantly monitors customer complaints*** and voluntarily recalls all the relevant vehicles to protect customers as soon as manufacturing defects assessed as highly likely to cause accidents are identified. When a vehicle recall is determined, we inform customers of the defects, corrective actions, and compensation including free service. We are also expanding sales guarantee provisions to proactively manage financial risks caused by recalls and quality assurance.

142. HMA claims that its staff "hand check nuts, bolts, cables, wiring and power components before any Hyundai leaves the plant. Then every vehicle is road tested to eliminate squeaks and rattles that can't be detected on the factory floor."[99] Further, HMA states that it has "250 robots, equipped with optical sensors far more sensitive than the

---

[99] https://www.auto-brochures.com/makes/Hyundai/Entourage/Hyundai_US%20Entourage_2008.pdf (last accessed March 18, 2024).

human eye, [that] inspect[] every vehicle for quality welds and proper fit. ***This ensures tight seams and seals***, as well as perfect alignment."[100]

143.  On information and belief, Defendants share the results and finds of its pre-sale testing and quality control checks with each other.

### 2.    Defendants' long history of defective components causing electrical short circuits in their vehicles.

144.  Fluid contaminating PCBs, resulting in short circuits and vehicle fires, is a well-known safety risk in the automotive industry—and one that each Defendant has extensive knowledge of.

145.  In 2016, KA recalled 2008-2009 Kia Sportage vehicles due to a defect which allows water to enter a component containing PCBs called a Hydraulic Electronic Control Unit ("HECU"), creating a risk of engine compartment fires and failure of the anti-lock brake ("ABS") system.[101] Between 2016 and September 2023, KA and HMA issued sixteen recalls, covering over 6.3 million vehicles due to this risk.[102] HMA and KA's "decision making and adherence with reporting requirements" with respect to the HECU fluid contamination defect is now under investigation by NHTSA's Office of Defects Investigation.[103]

146. Similarly, in August 2022, HMA and KA recalled more than 280,000 vehicles because "[d]ebris and moisture accumulation on the tow hitch harness module printed circuit board (PCB) may cause an electrical short, which can result in a fire."[104] Less than a year later, in March 2023, HMA and KA once again recalled an additional

---

[100] *Id*.

[101] NHTSA Campaign Number: 16V-815.

[102] NHTSA Recall Campaigns 16V815, 18V026, 20V061, 20V088, 20V518, 20V519, 20V520, 20V543, 21V160, 21V161, 21V303, 21V331, 21V137, 22V051, 22V056, 23V651, and 23V652.

[103] NHTSA Investigation Number: AQ23002.

[104] NHTSA Campaign Numbers: 22V-626; 22V-633.

570,000 vehicles because "[w]ater accumulation on the tow hitch harness module printed circuit board (PCB) may cause an electrical short, which can result in a fire."[105]

147. Given the common issue of fluid contaminating PCBs and short circuits affecting millions of Hyundai and Kia vehicles, Defendants did, or should have, performed diligent presale testing and monitoring for ECA defects within the Class Vehicles.

### 3.    Defendants' 2018 Recalls of the ECAs.

148. Defendants' knowledge of the Defect of short circuits occurring in the ECAs of the Class Vehicles is also supported by Defendants' 2018 safety recalls of the very same ECAs.

149. On April 20, 2018, KA announced the recall for a subset of Class Vehicles, approximately 27,000 2017 Kia Niro vehicles, due to a safety defect in the ECA that creates an electrical short, leading to fires. KA warned that "[t]he Hydraulic Clutch Actuator (HCA) inner oil seal may leak, allowing oil to accumulate in the cap area, possibly resulting in an electrical short."[106]

150. As is typical for the two sister brands that market vehicles with the same design and components, on April 24, 2018, HMA announced that it too was recalling over 10,000 2017 Hyundai Ioniq hybrid vehicles because "[t]he Hydraulic Clutch Actuator (HCA) inner oil seal may leak, allowing oil to accumulate in the cap area, possibly resulting in an electrical short."[107]

151. On May 17, 2018, LuK submitted a Defect Information Report with NHTSA affecting 37,185 vehicles.[108] LuK warned that "[a]n electrical short can increase the risk

---

[105] NHTSA Campaign Numbers: 23V-181; 23V-179.
[106] NHTSA Campaign Number: 18V257.
[107] NHTSA Campaign Number: 18V260.
[108] NHTSA Campaign Number: 18E0330.

42

of a fire" and stated that "LuK is working with the affected vehicle manufacturers" to remedy the defect.[109]

### 4. Defendants' monitoring of customer complaints and warranty claims.

152. On information and belief, KA's and HMA's customer relations divisions regularly receive and respond directly to customer calls concerning, *inter alia*, product defects and safety issues. Through these sources, Defendants were made aware of the Defect and had knowledge of its potential danger.

153. On information and belief, HMA's and KA's customer relations departments, which interact with authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues, have received numerous reports of the Defect in Class Vehicles. Customer relations also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

154. Defendants' warranty departments similarly review and analyze warranty data submitted by their dealerships and authorized technicians in order to identify defect trends in their vehicles. Defendants dictate that when a repair is made under warranty (or warranty coverage is requested), service centers must provide Defendants with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case Defendants later determine to audit the dealership or otherwise verify the warranty repair. For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to Defendants because Defendants will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

---

[109] https://static.nhtsa.gov/odi/rcl/2018/RCAK-18E033-9734.pdf (last accessed March 18, 2024).

155. Upon information and belief, each Defendant knew or should have known about the Defect because of the high number of complaints concerning the hybrid engine system, stalling issues, vehicle fires, and replacement ECAs likely ordered from Defendants. All HMA and KA service centers are required to order replacement parts, including ECAs directly from HMA, HMC, KA, or KC. Other independent vehicle repair shops that service Class Vehicles also order replacement parts directly from Defendants. HMA, HMC, KA, and KC routinely monitor part sales reports and are responsible for shipping parts requested by dealerships and technicians. Thus, HMA, HMC, KA, and KC have detailed, accurate, and real-time data regarding the number and frequency of replacement part orders. The increase in orders of auto-parts necessary to fix damage caused by the Defect in Class Vehicles was known to HMA, HMC, KA, and KC, and should have alerted them to the scope and severity of the Defect.

156. On information and belief, the customer relations and warranty divisions of HMA, HMC, KA, and KC interact with one another and discuss potential issues in Hyundai and Kia vehicles which share components and designs.

157. On information and belief, the engineering offices, safety offices, and safety investigators of HMA, HMC, KA, and KC interact with one another and discuss potential issues in Hyundai and Kia vehicles which share components and designs.

158. On November 27, 2020, NHTSA announced that it had entered into consent orders with Hyundai America and Kia America, which included combined penalties of $210 million.[110] The consent orders and fines "reflect [NHTSA's] assessment that both Hyundai and Kia conducted untimely recalls of over 1.6 million vehicles … and inaccurately reported certain information to NHTSA regarding the recalls."[111]

159. As part of the pair of 2020 consent orders, KA agreed that its Chief Safety Officer "will have a formal liaison with HMA, [HMC], and [KC] to review emerging

---

[110] https://www.nhtsa.gov/press-releases/nhtsa-announces-consent-orders-hyundai-and-kia-over-theta-ii-recall (last accessed March 18, 2024).

[111] *Id.*

issues with common components on a regular basis and share information about field inputs or reports regarding common platforms and/or components."[112] Likewise, HMA agreed that its "CSO will have a formal liaison with [KA], [KC], and HMC to review emerging issues with common components on a regular basis and share information about field inputs or reports regarding common platforms and/or components."[113]

160. Defendants also regularly monitor the NHTSA databases as part of their ongoing obligation under the TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000), to identify potential defects in their vehicles. Among other employees, HMA and KA customer service departments are responsible for monitoring customer complaints posted to NHTSA's public database, as well as their respective websites or third-party websites.

161. Hyundai has also stated publicly that it "ha[s] a robust system in place for monitoring and investigating reported vehicle fires that includes investigation and reporting to NHTSA as required."[114]

162. As recently as February 2024, Hyundai reiterated to *Consumer Reports* that it "actively monitors and evaluates potential safety concerns, including non-collision fires, with all our vehicles."[115]  And "Kia said it continuously evaluates its vehicles, including 'the investigation of allegations of vehicle fire, determination of cause and origin where possible, evaluation of the potential for more fires from the same identified cause, and initiation of a recall if the data shows a previously undiscovered defect trend poses an unreasonable risk of harm to members of the public.'"

---

[112] https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/rq17-003_kia_consent_order_executed_11272020.pdf (last accessed March 18, 2024).

[113] https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/rq17-004_hyundai_consent_order_executed_11272020.pdf (last accessed March 18, 2024).

[114] https://www.autoblog.com/2018/10/12/hyundai-kia-fires-center-for-auto-safety/?guccounter=1 (last accessed March 18, 2024).

[115] https://www.consumerreports.org/cars/car-recalls-defects/why-so-many-hyundai-kia-vehicles-get-recalled-for-fire-risk-a1169940635/ (last accessed March 18, 2024).

163. As part of a 2014 Consent Order entered into by HMA and HATCI with NHTSA, HMA "commit[ed] and agree[ed] to … [make] corporate organizational and process improvements" including the creation of a U.S. Technical Committee to review and make decisions regarding potential safety recalls. The head of the U.S. Technical Committee was also granted "direct access to the board of directors and the Chief Executive Officer ('CEO') of [HMA]."[116]

164. Under the 2020 Kia consent order, Kia was required to create a new U.S. safety office headed by a Chief Safety Officer, as well as "develop and implement sophisticated data analytics programs to better detect safety-related concerns." As part of the decree, KA "committed to substantial organizational improvements to enhance their ability to identify and investigate potential safety issues in the United States[.]" Among other things, the Hyundai consent order provides that "Kia will *significantly* increase staffing for vehicle safety issues" who "will perform data analysis, engineering investigations, preparation for meetings with NHTSA, recall planning and execution, and compliance with NHTSA statutes and regulations."[117]

**F. Despite their knowledge of the Defect, Defendants have yet to recall all Class Vehicles due to the Defect or offer a complete remedy.**

165. On July 31, 2023, KA announced that it was issuing a safety recall campaign for all Kia Class Vehicles due to the Defect.[118] Specifically, KA announced that it was recalling all 2017-2022 Niro HEV vehicles and 2018-2022 Niro PHEV vehicles due to a defect that causes engine compartment fires.[119]

---

[116] https://www.nhtsa.gov/sites/nhtsa.gov/files/2021-11/TQ14-002-Hyundai-Consent-Order-8-7-2014-tag.pdf (last accessed March 14, 2024).

[117] https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/rq17-003_kia_consent_order_executed_11272020.pdf (last accessed March 14, 2024).

[118] https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V534-5538.PDF (last accessed March 14, 2024).

[119] https://static.nhtsa.gov/odi/rcl/2023/RCAK-23V534-6507.pdf (last accessed March 14, 2024).

166. In its Recall Report, KA described the "Defect," "Safety Risk," and "Cause":[120]

> Description of the Defect: The printed circuit board (PCB) in the Hydraulic Clutch Actuator (HCA) may become contaminated with fluid. A fluid contaminated PCB may lead to an electrical short circuit, thereby increasing the risk of an engine compartment fire while driving.

> Description of the Safety Risk: A fire increases the risk of injury.

> Description of the Cause: An electrical short circuit due to fluid contamination on the Hydraulic Clutch Actuator printed circuit board.

167. KA disclosed that the defective components were supplied by Schaeffler and contained part numbers: "41050-2B001," "41050-2B002," and "41050-2B003."[121]

168. According to a filing submitted by KA to NHTSA in connection with the Recall, KC was critical to the analysis of the Defect, which led the decision to issue the Recall and what the "remedy" would be. KA disclosed that "Kia HQ" (i.e., KC) worked with the "supplier" (i.e., Schaeffler) to conduct investigations into reports of Class Vehicles suffering from the Defect and "f[ou]nd corrosion in the PCB and localized melting of incident parts[.]"[122] Ultimately, KC's analysis "confirm[ed] 1) evidence of fluid contamination on PCB potentially from external sources but no evidence of internal leaks or brake fluid on the printed circuit board, 2) contaminated PCB can cause an electrical short circuit, and 3) PCB short circuit can lead to a fire as confirmed by

---

[120] https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V534-5538.PDF (last accessed March 18, 2024).

[121] *Id*.

[122] https://static.nhtsa.gov/odi/rcl/2023/RMISC-23V534-5049.pdf (last accessed March 18, 2024).

duplication testing."[123] The day after KC "complete[d] its analysis," KA issued the 2023 Recall.[124]

169.  Although KA acknowledges that the ECAs installed in these vehicles contain a potentially lethal defect, the company's "remedy" does not include mandatory replacement of the ECAs. Rather, "Kia will instruct dealers to inspect the HCA and replace, if necessary. Kia will also install a new HCA fuse with one of a different capacity to mitigate the potential risk of fire caused by an electrical short circuit."[125] This remedy is deficient for several reasons.

170.  In its Technical Service Bulletin to its authorized dealerships, KA reveals that its "inspection" is in name only, as the dealerships will merely look to see if a DTC was triggered.[126] The inspection does not instruct dealerships to actually *inspect* the ECA to check whether the component's PCB is already contaminated. And if KA decides to replace the ECA after the "inspection" reveals a dangerous DTC was triggered, the replacement ECA is the same model and suffers from the same defect which makes it susceptible to fluid entering into its PCB.

171.  Next, KA's purported "remedy" decidedly does not "remedy" the "Cause of the Defect: An electrical short circuit due to fluid contamination on the Hydraulic Clutch Actuator printed circuit board." Instead, KA attempts to alleviate one of the Defect's symptoms (vehicle fires) by offering to replace the fuse between the ECA and the vehicle's 12V battery so that in the event of a short circuit—the risk for which is wholly left intact—the ECA will be cut off from power. But even assuming the new fuse can prevent a fire, it just creates another dangerous problem for drivers, passengers, and bystanders. Once the ECA is cut off from power, a host of safety issues are created as

---

[123] *Id.*

[124] *Id.*

[125] https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V534-5538.PDF (last accessed March 18, 2024).

[126] https://static.nhtsa.gov/odi/rcl/2023/RCRIT-23V534-0846.pdf (last accessed March 18, 2024).

the vehicle is unable to safely rely on the ICE. Among other things, this could result in the inability to start the vehicle, accelerate, or cause the vehicle to stall while in the middle of a highway.

172. Indeed, KA warns that even after its purported "fix" is performed on Class Vehicles "[c]ustomers may experience illumination of the HEV warning light ⚠HEV."[127]

173. KA warns in its 2020 Kia Niro HEV/PHEV Owner's Manual that "[i]f the 'HEV Warning' light turns on in the driver instrument cluster…. **stop the engine immediately**."[128] Elsewhere, Kia warns drivers that "If this occurs, pull over to a safe location and contact Kia… to request to have your vehicle towed to the nearest authorized Kia dealership as soon as possible."[129]

174. Likewise, HMA warns in its 2020 Ioniq HEV Owner's Manual: "When the [HEV] Service warning light (⚠HEV) illuminates on the instrument cluster, **immediately stop the engine**, and contact an authorized HYUNDAI dealer."[130] HMA explains that "[t]his warning light illuminates:… When there is a problem with the hybrid vehicle control system or hardware."[131]

175. At least one person recognized the overall failure of KA's purported "remedy." In an online forum dedicated to Kia Niro vehicles, "What would happen to the transmission if the clutch actuator failed in the middle of a shift due to the fuse blowing prematurely because they derated it so much … I feel this is really an unacceptable 'fix'[.] If this 'recall' ever expands to cover the 2024, I would really have

---

[127] https://static.nhtsa.gov/odi/rcl/2023/RCMN-23V534-7526.pdf (last accessed March 18, 2024).

[128] 2020 Owner's Manual, at 6:11, *available at* https://owners.kia.com/content/owners/en/manuals.html (last accessed March 19, 2024).

[129] https://static.nhtsa.gov/odi/rcl/2023/RCONL-23V534-2175.pdf (last accessed March 18, 2024).

[130] https://cdn.dealereprocess.org/cdn/servicemanuals/hyundai/2020-ioniqhybrid.pdf (last accessed March 18, 2024).

[131] *Id.*

to think hard about whether to accept this change, leave the fuse at its original rating or thinking like an engineer instead of a lawyer, to only slightly derate it to maybe 25 or 30A to balance out the risk of a fire with risk of transmission damage due to the fuse blowing during extremes of normal operation…" [132] Another person replied, stating that "[a]s an experiment, [he or she] removed the Clutch Actuator fuse and, as expected, the car wouldn't start[.]"[133]

176. Accordingly, the 2023 Recall offers a "remedy" in name only. It is indisputable that the risk of "the [PCB] in the [ECA]… becom[ing] contaminated with fluid,"[134] is left wholly intact by the "remedy" offered in the Recall. This glaring failure of the Recall was recognized by a Class Member who complained that a blown fuse could "affect the HCA and functionality of the Niro" and that "the root cause of the fuse blowing or fluid ignition is still present."[135]

177. To make the matter worse, KA states in the TSB that if one of the DTCs relating to the Defect (*see supra* ¶ 125) are found, the vehicle is unsafe to be driven and cannot leave the dealership without a replacement ECA. But KA has yet to offer replacement ECAs. Moreover, Plaintiff and other Class Members had no idea that bringing in their Class Vehicles pursuant to the Recall could essentially result in the confiscation of their cars. Only when Plaintiff brought her car into an authorized Kia dealership on January 22, 2024, was she informed that "if [sic] fails inspection they cannot drive vehicle." And Plaintiff is not alone; other Class Members reported that they

---

[132] https://www.kianiroforum.com/threads/safety-recall-hydraulic-clutch-actuator.12030/, post # 22 (last accessed March 18, 2024).

[133] *Id*. post #25.

[134] https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V534-5538.PDF (last accessed March 18, 2024).

[135] https://www.kianiroforum.com/threads/recall-for-danger-of-fire-in-engine.11934/#post-118354, post #32 (last accessed March 18, 2024).

too only learned of the potential confiscation of their vehicles when they brought their cars to Kia dealerships.[136]

178.  Finally, Defendants have yet to recall or make any attempt to fix the Defect in the Hyundai Class Vehicle even though they contain the same ECAs as found in the recalled Kia Class Vehicles.

**G. HMA and KA falsely claim to offer the best warranty program in the nation, yet fail to offer a remedy for the Defect.**

179.  HMA and KA advertise their warranty program as "industry-lead[ing]"[137] and "America's Best Warranty."[138]

180.  KA's warranty begins with the representation that "[t]he latest engineering techniques have been incorporated into the design and production of your Kia Vehicle."[139] HMA states that in addition to "giving [owners] added peace of mind, [its] warranty support[s] [HMA's] commitment to provide vehicles of high quality, dependability and reliability."[140]

181.  KA offers a 10-year/100,000 mile Hybrid System Warranty, which covers components "originally manufactured or installed by Kia Motor Company, Kia Motors Manufacturing Georgia (KMMG) or Kia Motor America (KMA) that are found to be

---

[136]https://www.kianiroforum.com/threads/safety-recall-hydraulic-clutch-actuator.12030/ post #38 ("Be aware, the dealer I went to, will not release the vehicle if they find a HCA issue[.]").

[137] https://owners.kia.com/us/en/service-page/warranty.html (last accessed March 18, 2024).

[138] https://www.hyundaiusa.com/us/en/assurance/america-best-warranty (last accessed March 18, 2024).

[139] https://www.kia.com/us/content/dam/kia/us/en/images/warranty/manual/general-warranty-and-consumer-info/2020_warranty.pdf (last accessed March 18, 2024).

[140] https://www.hyundaiusa.com/us/en/assurance/america-best-warranty (last accessed March 18, 2024).

defective in material or factory workmanship under normal use and maintenance[.]"[141] KA specifies that the warranty provides for the "[r]epair or replacement of HYBRID SYSTEM components," which include "Hybrid Battery Pack Assy, Hybrid Starter & Generator, Hybrid Power Control Unit, Traction Motor, *clutch*, On board charger (OBC) and all internal parts." KA further warns that "it will arrange for independent Kia brand service facilities at locations of its choice to provide for the repair of your vehicle if it fails to function properly during normal use."

182.  HMA too offers a 10-year/100,000 mile Hybrid and Plug-in Hybrid System Warranty, which covers: "[r]epair or replacement of HYBRID SYSTEM components … originally manufactured or installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai Motor Manufacturing Alabama (HMMA), Kia Motors Manufacturing Georgia (KMMG), Kia Manufacturing Mexico (KMM) or Hyundai Motor America (HMA) that are found to be defective in material or factory workmanship under normal use and maintenance[.]"[142] HMA states that the components covered by this warranty are those "that are directly attached to or integral to operation of the Hybrid Battery; Hybrid Battery Wire Harness; Battery Management System and Wire Harness; Blower Assembly; Electronic Air Compressor; Active Air Flap Active Hydraulic Booster; EV Fuse; Service Disconnect Plug; Power Relay Assembly; Hybrid Starter & Generator; Auto Transmission & Traction Motor including housing case; clutch and all internal parts; Hybrid Power Control Unit; Electronic Oil Pump Assembly; Electronic Water Pump with In and Out Hose Module."[143]

---

[141] 2020 Warranty and Consumer Information Manual, at 14, *available at* https://owners.kia.com/content/owners/en/manuals.html (last accessed March 18, 2024).

[142] https://owners.hyundaiusa.com/content/dam/hyundai/us/myhyundai/manuals/factory-warranty/2019/Hyundai%20USA%20ALL%20119MY.pdf (last accessed March 18, 2024).

[143] *Id.*

183. But in reality, HMA's and KA's warranty programs bring little comfort to Class Vehicle owners. Despite HMA's and KA's promises, they have consistently evaded their warranty obligations by failing to inform consumers that their vehicles are defective and by refusing to repair or replace the ECAs in their vehicles affected by the Defect.

184. As noted above, the 2023 Recall does not satisfy KA's warranty obligations as it does nothing to "repair or replac[e]" the defective ECAs. Plaintiff Doucette brought her Class Vehicle into an authorized Kia dealership on January 22, 2024, pursuant to the Recall; she was denied an adequate "repair or replacement" of the defective ECA.

**H. Fraudulent Omission/Concealment Allegations**

185. Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals employed by Defendants responsible for making false and misleading statements regarding the Class Vehicles. Defendants necessarily are in possession of all of this information. Plaintiffs' claims arise out of Defendants' fraudulent omission/concealment of the Defect, despite their representations about the quality, reliability, and safety of the Class Vehicles.

186. Plaintiffs allege that at all relevant times, including specifically at the time they and Class Members purchased their Class Vehicles, Defendants knew, or were reckless in not knowing, of the Defect; Defendants had a duty to disclose the Defect based upon their exclusive knowledge; and Defendants never disclosed the Defect to Plaintiffs or the public at any time or place in any manner prior to the 2023 Recall.

187. Plaintiffs make the following specific concealment/omission-based allegations with as much specificity as possible absent access to the information necessarily available only to Defendants:

188. *Who*: each Defendant (HMA, HMC, KA, and KC) actively concealed and omitted the Defect from Plaintiffs and Class Members while simultaneously touting the quality, safety, and dependability of the Class Vehicles, as alleged herein. Plaintiffs are

unaware of, and therefore unable to identify, the true names and identities of those specific individuals responsible for such decisions.

189. ***What***: that the Class Vehicles contain the Defect, as alleged herein. Defendants concealed and omitted the Defect while making representations about the safety, dependability, and other attributes of the Class Vehicles, as alleged herein.

190. ***When***: Defendants concealed and omitted material information regarding the Defect at all times while making representations about the quality, safety, and dependability of the Class Vehicles on an ongoing basis, and continuing to this day. Defendants still have not disclosed the truth about the full scope of the Defect in the Class Vehicles. And when consumers brought their vehicles to HMA and KA dealerships or called Defendants' respective customer service and warranty departments complaining of the Defect, Defendants denied an adequate repair for the Defect and warranty coverage.

191. ***Where***: Defendants concealed and omitted material information regarding the true nature of the Defect in every communication they had with Plaintiffs and Class Members and made representations about the quality, reliability, and safety of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing, in which Defendant disclosed the truth about the full scope of the Defect in the Class Vehicles prior to the 2023 Recall. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Defendants' websites. There are channels through which Defendants could have disclosed the Defect, including, but not limited to: (1) point of sale communications; (2) the owner's manual; and/or (3) direct communication to Class Members through means such as state vehicle registry lists and e-mail notifications.

192. ***How***: Defendants concealed and omitted the Defect from Plaintiffs and Class Members and made representations about the quality, safety, and dependability of the Class Vehicles. Each Defendant actively concealed and omitted the truth about the existence, scope, and nature of the Defect from Plaintiffs and Class Members at all times,

even though they each knew about the Defect and knew that information about the Defect would be important to a reasonable consumer, and Defendants promised in their marketing materials that Class Vehicles have qualities that they do not have.

193. *Why*: Defendants actively concealed and omitted material information about the Defect in the Class Vehicles for the purpose of inducing Plaintiffs and Class Members to purchase and/or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles, and made representations about the quality, safety, and durability of the Class Vehicles. Had Defendants disclosed the truth, for example, in their advertisements or other materials or communications, Plaintiffs and Class Members (all reasonable consumers) would have been aware of it, and would not have bought or leased the Class Vehicles or would not have paid as much for them.

## V.    TOLLING OF STATUTES OF LIMITATIONS

194. Any applicable statute(s) of limitations have been tolled by HMA's, HMC's, KA's, and KC's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and the members of the Class could not have reasonably discovered the true nature of the Defect because Defendants concealed it. Plaintiffs' claims were thus tolled pursuant to the discovery rule, for fraudulent concealment, and for estoppel.

### A. Discovery Rule

195. The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Class Vehicles contained the Defect.

196. As alleged above, Class Members had no way of knowing about the Defect in their Class Vehicles. HMA, HMC, KA, and KC concealed their knowledge of the Defect while KA and HMA continued to market and sell the Class Vehicles as safe, secure, high-quality, and reliable vehicles. To this day, Defendants failed to disclose the full extent of the Defect and the risks faced by Class Vehicle drivers.

197. Within any applicable statutes of limitation, Class Members could not have discovered through the exercise of reasonable diligence that HMA, HMC, KA, and KC

were concealing the conduct complained of herein and misrepresenting the true qualities of the Class Vehicles.

198. Class Members did not know facts that would have caused a reasonable person to suspect that there was a Defect affecting their vehicle and an ordinary person would be unable to appreciate that the vehicle was defective. Indeed, even after Class Members contacted KA and HMA and/or their authorized dealers for vehicle repairs concerning the Defect, they were routinely told by Defendants and/or through their dealers that the Class Vehicles were not defective and/or they were offered a "remedy" that leaves the defective ECAs in the vehicles and does not alleviate the safety risks, including hybrid engine issues and vehicle stalls, caused by the Defect. As described above, the true cause of the engine compartment fires and short circuiting in the Class Vehicles is a defect caused by the defective design and/or manufacturing of ECAs and new fuses do not address the cause of vehicle fires or remedy the full risk posed by the Defect.

199. For ordinary consumers, the existence and partial extent of the Defect only came to light after KA issued the 2023 Recall.

200. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to the claims in this litigation.

**B. Fraudulent Concealment**

201. As the manufacturers, distributors, sellers, and/or warrantors of the Class Vehicles, HMA, HMC, KA, and KC were under a continuous duty to disclose to Class Members the existence of the Defect found in the Class Vehicles.

202. Defendants were and remain under a continuing duty to disclose to Plaintiffs and the Members of the Class the true character, quality, and nature of the Class Vehicles, that the Defect found in the Class Vehicles will result in catastrophic engine compartment fires, inability to accelerate, and vehicle stalls, among other safety risks, that they will

require costly repairs, pose safety concerns, cause damage to their personal property, and diminish the resale value of the Class Vehicles.

203. HMA, HMC, KA, and KC recklessly disregarded the true nature, quality, and character of the Class Vehicles, by failing to disclose the existence of the Defect.

204. Due to each Defendant's concealment throughout the time period relevant to this action, all applicable statutes of limitation have been tolled.

205. Instead of publicly disclosing the Defect in the Class Vehicles, Defendants kept owners and lessees in the dark about the Defect present in their vehicles. To this day, Defendants have knowingly or recklessly failed to disclose the full extent of the Defect and have failed to offer adequate remedies for the Defect.

206. Class Members were not at fault for failing to discover the existence of the Defect present in their Class Vehicles.

207. Until the 2023 Recall was issued, Plaintiffs had no actual or presumptive knowledge of facts sufficient to put them on inquiry notice of such a connection. In particular, Class Members did not possess the aggregate data concerning ECA failures, engine compartment fires, or vehicle stalls in Class Vehicles, or the technical data related to the design and manufacturing of the Class Vehicles.

208. This ignorance of the existence of the Defect present in the Class Vehicles is common across each Plaintiff and Class Member.

**C. Estoppel**

209. HMA, HMC, KA, and KC were, and are, under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Class Vehicles. HMA, HMC, KA, and KC failed to disclose the existence of the Defect and actively concealed the true character, quality, and nature of the Class Vehicles while knowingly making representations about the quality and reliability of the Vehicles. Plaintiffs and Class Members reasonably relied upon each Defendant's knowing and affirmative representations and/or active concealment of these facts. Based on the

foregoing, each Defendant is estopped from relying on any statutes of limitation in defense of this action.

## VI.   CALIFORNIA LAW APPLIES TO NATIONWIDE CLAIMS

210. California law applies to Plaintiffs' nationwide claims because Plaintiffs' injuries emanate from Defendants' actions in California. Each pertinent decision relates to the decision to conceal the Defect from Class Members and fails to remedy the Defect, including the marketing, commercial distribution, and warranty coverage for the Class Vehicles in the United States, was made from HMA's and KA's California headquarters by their respective executives and employees located in California.

211. Defendant HMA is headquartered in Fountain Valley, California and is the sole entity in the United States responsible for distributing, selling, leasing, and warranting Hyundai Class Vehicles.

212. On HMA's website, the company promotes a quote by Brandon Ramirez, Director, Corporate Social Responsibility and External Relations (who is based in Fountain Valley),[144] which states that "[e]very aspect of a car model, from the initial concept all the way until it launches and even planning the next generation, happens right here in the U.S."[145]

213. HMA's C-Suite, and employees responsible for HMA's distribution of Class Vehicles, decision to conceal the Defect, HMA's public statements to the U.S. market concerning Class Vehicles, as well as whether to repair the Defect and issue a recall, are also based in California.

---

[144] https://www.linkedin.com/in/brandon-ramirez-b891265 (last accessed March 18, 2024).

[145] https://www.hyundaiusa.com/us/en/why-hyundai/made-in-america?adobe_mc=MCMID%3D3060361225477159011173619019993713953%7CMCORGID%3DC3BCE0154FA24300A4C98A1%2540AdobeOrg%7CTS%3D1626118865 (last accessed March 18, 2024).

214. José Muñoz serves as the President and Global Chief Operating Officer of HMC and the President and CEO of HMA.[146] "Based in Hyundai's U.S. headquarters in Fountain Valley, California," Mr. Muñoz oversees the entire American market.

215. Brian Latouf served as the Global Chief Safety Officer of HMA from December 2019 through July 2022, when he was appointed to the same role for HMC.[147] Based in California, Mr. Latouf is responsible for all safety regulation matters, including the strategic legal direction and oversight of all safety investigations and recalls in the U.S., Canada and Mexico. His current title is President and Global Chief Safety and Quality Officer, Hyundai Motor Group. He reports jointly to HMC's CEO, Jay Chang and KC's CEO, Ho Sung Song.

216. Wayne Gates serves as Director of Product Analysis Group at HMA.[148] Based in Fountain Valley, California, Mr. Gates oversees, among other things, safety, compliance, and regulatory issues involving Hyundai vehicles, and liaisons with NHTSA regarding Hyundai recalls.[149]

217. Omar Rivera serves as HMA's Executive Director of Quality and Service Engineering.[150] Based in Fountain Valley, California, Mr. Rivera and his team are

---

[146] https://www.hyundainews.com/en-us/bios/jose-munoz (last accessed March 18, 2024).

[147] https://www.hyundainews.com/en-us/bios/brian-latouf- (last accessed March 18, 2024); https://www.linkedin.com/in/brian-latouf-b6a8b7b4/ (last accessed March 18, 2024); https://www.prnewswire.com/news-releases/hyundai-motor-appoints-brian-latouf-to-lead-new-global-safety-office-301589377.html (last accessed March 18, 2024).

[148] https://www.linkedin.com/in/wayne-gates-b8a85b7/ (last accessed March 19, 2024).

[149] *Id*.; https://static.nhtsa.gov/odi/rcl/2018/RCAK-18V260-2054.pdf (last accessed March 19, 2024).

[150] https://www.hyundainews.com/en-us/bios/omar-rivera (last accessed March 19, 2024).

responsible for model line engineering and engineering analysis, among other responsibilities.[151]

218.  Paul Imhoff serves as Director of Marketing Performance at HMA.[152] Based in Fountain Valley, California, Mr. Imhoff is responsible "for the business's day-to-day tactical and strategic operations and also support of sales and marketing analytics in order to drive performance improvements and reports directly to the Chief Marketing Officer."[153] Prior to his current role, Mr. Imhoff served as HMA's Director of Customer Experience, where he "[oversaw] all aspects of the customer experience, from retail processes and after sales improvements to call centers and customer feedback surveys."

219.  Danial Kim serves as the Senior Group Manager of North America Safety Office at HMA at the company's offices in California, and previously served as a Senior Manager of Engineering & Design Analysis.[154] Mr. Kim serves as Hyundai's "[l]iaison responsible for corporate compliance with NHTSA enforcement of potential safety-related product defects." Mr. Kim also "facilitate[es] product safety recall/campaign decisions in accordance with federal regulation and guidelines, manage[s] [ ] TREAD compliance program including EWR reporting, collaboration with ODI in joint product safety investigations, recall filing and completion reporting, coordinating with overseas R&D, manufacturing, and service in identifying and closing potential safety defects."

---

[151] *Id.*; https://www.linkedin.com/in/omar-rivera-a917363/(last accessed March 19, 2024).

[152] https://www.hyundainews.com/en-us/bios/paul-imhoff (last accessed March 19, 2024).

[153] *Id.*; https://www.linkedin.com/in/pimhoff/ (last accessed March 19, 2024).

[154] https://www.linkedin.com/in/daniel-kim-60013228/ (last accessed March 19, 2024).

220. Cole Stutz serves as the Executive Director of Vehicle Safety at HMA.[155] Based in Fountain Valley, California, Mr. Stutz liaisons with NHTSA regarding safety recalls, among other things.[156]

221. Scott Stewart serves as the Senior Group Manager of Vehicle Safety Investigations at HMA and is based at the company's Fountain Valley, California offices.[157]

222. Barry Ratzlaff serves as the Chief Customer Officer of HMA.[158] In this role, he is responsible for Hyundai's customer experience strategy, retail process, sales and service training, product quality and service engineering. Mr. Ratzlaff is a 30-year automotive veteran with roles in manufacturing, quality and product development. Mr. Ratzlaff is based in Fountain Valley, California.

223. Angela Zepeda serves as the Chief Marketing Officer for HMA.[159] Based in Fountain Valley, California, Ms. Zepeda "is responsible for all of Hyundai's marketing and advertising activities in the U.S., including the strategic direction, brand development, national and regional advertising, experiential marketing, digital and social media, brand partnerships, and lead generation, among other responsibilities."[160]

---

[155] https://www.linkedin.com/in/cole-stutz-2b7796103/ (last accessed March 19, 2024).

[156] *Id.*; https://static.nhtsa.gov/odi/rcl/2021/RCAK-21V303-6447.pdf (last accessed March 19, 2024).

[157] https://www.linkedin.com/in/scott-stewart-10048094/ (last accessed March 19, 2024).

[158] https://www.hyundainews.com/en-us/bios/barry-ratzlaff (last accessed March 19, 2024); https://www.linkedin.com/in/barry-ratzlaff-54b40811/ (last accessed March 19, 2024).

[159] https://www.hyundainews.com/en-us/bios/angela-zepeda (last accessed March 19, 2024).

[160] *Id.*; https://www.linkedin.com/in/angela-zepeda-8bb8293/ (last accessed March 19, 2024).

224. Randy Parker serves as Chief Executive Officer for HMA.[161] Prior to his promotion in July 2022, Mr. Parker served as Senior Vice President of National Sales at HMA where he was "responsible for all aspects of sales and distribution of Hyundai vehicles in the U.S., including sales strategies, fleet and certified pre-owned operations, dealer relations, market representation, and other related activities with the mission to grow Hyundai sales and market share."[162] As CEO, Mr. Parker, "is responsible for Hyundai's commercial automotive operations in the United States." Mr. Parker is based in Fountain Valley, California.

225. Fred DePerez serves as the Senior Vice President of Global Product Line Management  for HMC.[163] Based in Fountain Valley, California, Mr. DePerez oversees Product Line Management, Sales Planning, and Retail Operations.[164]

226. David VandeLinde is the Vice President of After-Sales for HMA and based in Fountain Valley, California.[165] In this role, Mr. VandeLinde is responsible for leading dealer service programs and operations, parts and accessory sales, and owner marketing. Prior to his current role, Mr. VandeLinde served as the director of Dealer Service Process where he oversaw Hyundai's retail service process, parts planning, parts and service field

---

[161]  https://www.prnewswire.com/news-releases/randy-parker-named-chief-executive-officer-of-hyundai-motor-america-301595523.html (last accessed March 19, 2024).

[162] *Id.*; https://www.linkedin.com/in/randy-parker-24806232/ (last accessed March 19, 2024);  https://www.hyundainews.com/en-us/releases/2780 (last accessed March 19, 2024).

[163] https://www.hyundainews.com/en-us/bios/fred-deperez (last accessed March 19, 2024).

[164] *Id.*; https://www.linkedin.com/in/freddeperez/ (last accessed March 19, 2024).

[165] https://web.archive.org/web/20221005193136/https://www.hyundainews.com/en-us/bios/david-vandelinde  (last accessed March 19, 2024); https://www.linkedin.com/in/dave-vandelinde-6b2b2078/ (last accessed March 19, 2024).

ops, and parts and service training. Mr. VandeLinde was also central to HMA "establishing and operationalizing a platform for gathering and publishing dealer best practices, developing and publishing the first ever Hyundai Service Process Manual (the Car Care Process Guide), and revolutionizing Hyundai's approach to field training to be more experiential."

227. Kate Fabian serves as the Director of Marketing Communications for HMA.[166] Based in Fountain Valley, California, Ms. Fabian "is responsible for brand strategy and planning, multicultural marketing, media strategy, national and regional dealer advertising, experiential marketing, branded content and social media."[167]

228. Ricky Lao serves as HMA's Director of Product Planning.[168] Based in Fountain Valley, California, Mr. Lao and his team are "responsible for leading the product planning process from concept phase through product launch, and subsequent lifecycle management, for all current and future cars and SUVs representing the Hyundai North American market."

229. Additionally, HMA's "Customer Care Center," which handles customer complaints and warranty inquiries for Hyundai Class Vehicle owners and lessees, is located in Fountain Valley.[169]

---

[166] https://www.hyundainews.com/en-us/bios/kate-fabian-- (last accessed March 19, 2024).

[167] *Id*.; https://www.linkedin.com/in/kate-fabian-b1150412/ (last accessed March 19, 2024).

[168] https://www.hyundainews.com/en-us/bios/ricky-lao (last accessed March 19, 2024); https://www.linkedin.com/in/ricky-lao-189303/ (last accessed March 19, 2024).

[169] https://www.hyundaiusa.com/content/dam/hyundai/us/com/pdf/assurance/2021_Owners_Handbook_Warranty.pdf (last accessed March 19, 2024).

230. On information and belief, HMA's website, including the "Consumer Assistance Center" webpage,[170] is managed by Hyundai's marketing and customer service departments located in Fountain Valley.

231. In addition to HMA's engineering and safety investigation teams responsible for post-sale investigations located at its Fountain Valley headquarters, HMA conducts pre-sale testing in California, including at its "California Proving Ground" and the "Hyundai Design and Technical Center" located in Irvine.[171] The Hyundai Design and Technical Center is HMA's "90,000-square-foot, $30 million state-of-the-art facility" and "is home to Hyundai automobile designers, engineers, model-makers and technicians[.]"

232. Defendant KA is headquartered in Irvine, California and is the sole entity in the United States responsible for distributing, selling, leasing, and warranting Kia vehicles, including the Kia Class Vehicles.

233. KA's C-Suite, and employees responsible for KA's distribution of Class Vehicles', decision to conceal the Defect, Kia's public statements to the U.S. market concerning Class Vehicles, as well as whether to repair the Defect and issue a recall, are also based in California.

234. SeungKyu (Sean) Yoon is the President and CEO of KA and is responsible for its strategy and operations in the U.S., including its manufacturing.[172] Mr. Yoon is based at KA's headquarters in Irvine, California.

---

[170] https://owners.hyundaiusa.com/us/en/contact-us.html (last accessed March 19, 2024).

[171] *See* https://www.hyundainews.com/en-us/releases/1250; https://www.hyundainews.com/en-us/releases/1251 (last accessed March 19, 2024).

[172] https://www.kiamedia.com/us/en/media/pressreleases/13858/seungkyu-sean-yoon-1 (last accessed March 19, 2024); https://www.linkedin.com/in/seungkyu-sean-yoon-3251b1a9/ (last accessed March 19, 2024); https://www.automotiveworld.com/news-releases/kia-america-debuts-in-us-new-name-replaces-kia-motors-america-as-part-of-kia-corporation-global-brand-strategy/ (last accessed March 19, 2024).

235.  Russell Wager serves as KA's Vice President of Marketing and oversees all of the company's marketing communications including the marketing operations, media, digital, sponsorships and public relations areas.[173] Mr. Wager is based at KA's headquarters in Irvine, California.

236.  J.S. (Jurassic) Park serves as KA's Chief Safety Officer and Vice President of Regulatory Compliance.[174] Based at KA's headquarters in Irvine, California, Mr. Park participates in all safety-recall decision-making for the U.S. market and acts as the company's liaison with NHTSA regarding Kia recalls, among other things.

237.  KA's Regulatory Compliance managers and employees are also located at its headquarters in Irvine, California.[175] The Regulatory Compliance office works with KC and its affiliates (including HATCI) to, *inter alia*, monitor safety regulatory issues and advise on statements made to consumers, including on Monroney labels.

238.  Additionally, KA's "Customer Assistance Center" and Consumer Affairs Department, which handle customer complaints and warranty inquiries for Kia Class Vehicle owners and lessees, is located in Irvine, California.[176]

---

[173] https://www.kiamedia.com/us/en/media/pressreleases/17221/russell-wager (last accessed March 19, 2024); https://www.linkedin.com/in/russell-wager/ (last accessed March 19, 2024).

[174] https://static.nhtsa.gov/odi/rcl/2023/RCAK-23V534-6507.pdflast accessed March 19, 2024); https://static.nhtsa.gov/odi/rcl/2020/RCAK-20V518-6959.pdf (last accessed March 19, 2024).

[175] *See* https://www.linkedin.com/jobs/view/regulatory-compliance-manager-at-kia-motors-america-2432082551/?refId=db5aad21-355f-41fe-b515-f22f69d9a0e5&trackingId=61TH90nuMf9kICG1U9DG2A%3D%3D (last accessed March 19, 2024).

[176]https://www.kia.com/us/content/dam/kia/us/en/images/warranty/manual/general-warranty-and-consumer-info/2020_warranty.pdf (last accessed March 19, 2024).

239. On information and belief, KA's website, including the "Consumer Care Center" webpage,[177] is managed by KA's marketing and customer service departments located in Irvine, California.

240. In addition to KA's engineering and safety investigation teams responsible for post-sale investigations located at its Irvine headquarters, KA conducts pre-sale durability testing in California, including at its "California Proving Ground" and the Hyundai-Kia Design and Technical Center located in Irvine.[178] The "$30 million state-of-the-art" Design and Technical Center "houses more than 100 auto designers, engineers, model makers and technicians."

241. On information and belief, KA and KC conducted an investigation into the Defect and potential remedies in California at KA's California headquarters, which culminated in the 2023 Recall.

242. Finally, while KC participated in the investigation of the Defect in Kia Class Vehicles, the ultimate decisions concerning whether to recall the Class Vehicles were made by KA executives at its California headquarters.

## VII. CLASS ALLEGATIONS

243. Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

244. Plaintiffs seek to represent a class ("Nationwide Class") under the laws of the State of California defined as:

> All persons or entities that purchased or leased a Class Vehicle in the United States.

245. In addition, and in the alternative to the Nationwide Class, Plaintiffs seek to represent the following State Classes:

---

[177] https://ksupport.kiausa.com/ConsumerAffairs (last accessed March 19, 2024).

[178] https://www.hyundainews.com/en-us/releases/1270 (last accessed March 19, 2024).

<u>Massachusetts Class</u>: (represented by Plaintiff Doucette)
 All persons or entities that purchased or leased a Class Vehicle in the State of Massachusetts.

<u>Georgia Class</u>: (represented by Plaintiff Tongue)
 All persons or entities that purchased or leased a Class Vehicle in the State of Georgia.

246. The Nationwide Class and the State Classes are collectively referred to herein as the Classes.

247. Excluded from the Classes are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the Classes definitions based on discovery and further investigation.

248. <u>Numerosity</u>: Upon information and belief, the Classes are so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Classes are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that at least one hundred and fifty thousand Class Vehicles have been sold and leased in the United States.

249. <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Classes. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

    a.   Whether Defendants engaged in the conduct alleged herein;

    b.   Whether Plaintiffs' claims emanate from HMA's and KA's conduct in California;

    c.   Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

CLASS ACTION COMPLAINT

d.   Whether the Class Vehicles were sold with a safety defect;

e.   Whether Defendants knew of the Defect but failed to disclose the problem and its consequences to their customers;

f.   Whether a reasonable consumer would consider the Defect or its consequences to be material;

g.   Whether HMA and KA breached express and implied warranties with respect to the Defect;

h.   When Defendants discovered the Defect in the Class Vehicles, and what, if anything, they did in response;

i.   Whether Defendants should be required to disclose the existence of the Defect;

j.   Whether Defendants' conduct violates the California Legal Remedies Act and the other statutes asserted herein;

k.   Whether Plaintiffs and Class Members overpaid for their Class Vehicles; and

l.   Whether Plaintiffs and Class Members experienced out-of-pocket losses as a result of the Defect, and if so, how much.

250. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs purchased Class Vehicles with the same Defect as did each member of the Classes. Furthermore, Plaintiffs and all Members of the Classes sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendants' wrongful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class Members.

251. <u>Adequacy</u>: Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Classes that they seek to represent, they have retained counsel competent and highly experienced in complex class action litigation, and they intend to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

252. <u>Superiority</u>: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and Members of the Classes. The injury

suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for Members of the Classes individually to redress effectively the wrongs done to them. Even if the Members of the Classes could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers, warranty claims, registration records, and database of complaints.

253. Defendants have acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## VIII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT, Cal. Civ. Code § 1750, *et seq*. ("CLRA")

(Individually and on behalf of the Nationwide Class)
(As to all Defendants)

254. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

255. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

256. HMA, HMC, KA, and KC are each a "person" as that term is defined in California Civil Code § 1761(c).

257. Plaintiffs and the Class Members are "consumer[s]" as that term is defined in California Civil Code §1761(d).

258. In the course of their business, HMA, HMC, KA, and KC, through their agents, employees, and/or subsidiaries, engaged in unfair and deceptive acts in violation of the CLRA, Cal. Civ. Code § 1750, *et seq*., by the practices described above, and by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the quality, reliability, and safety of the Class Vehicles and the Defect, as detailed above. These acts and practices violate, at a minimum, the following sections of the CLRA:

    a.  (a)(2)  Misrepresenting the source, sponsorship, approval or certification of goods or services;

    b.  (a)(5)  Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

    c.  (a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

    d.  (a)(9) Advertising goods and services with the intent not to sell them as advertised; and

    e.  (a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

259. Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

260. HMA, HMC, KA, and KC knew that the Class Vehicles were defectively designed and/or manufactured and were not suitable for their intended use.

261. HMA, HMC, KA, and KC were each under an ongoing duty to Plaintiffs and the Class Members to disclose the defective nature of the Class Vehicles because:

    a.  Defendants had exclusive access to and were in a superior position to know the true state of facts about the safety Defect and associated costs in the Class Vehicles;

b. Given the Defect's hidden and technical nature, Plaintiffs and the Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had a dangerous Defect until it was disclosed by Defendants, or revealed in public media reports. Plaintiffs do not have access to information concerning ECA failures, engine compartment fires, or vehicle stalls in Class Vehicles available to Defendants, or the technical data related to the design and manufacturing of the Class Vehicles that each Defendant possess;

c. Defendants knew that Plaintiffs and the Class Members could not reasonably have been expected to learn or discover the safety Defect and the associated repair costs that it causes until it was disclosed by Defendants, or revealed in the public media;

d. Defendants knew that the Defect gave rise to safety concerns for the consumers who use the Class Vehicles, and the Defect would have been a material fact to the Class Members' decisions to buy or lease Class Vehicles;

e. Defendants made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, HMA, and KA intentionally concealed, suppressed, and failed to disclose to the consumers that the Class Vehicles contained the Defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, HMA and KA had the duty to disclose the whole truth; and

f. Defendants actively concealed the safety Defect by knowingly failing to issue a complete recall of Class Vehicles that offers a true remedy for the Defect.

262. As detailed above, Defendants were actually or constructively aware of the Defect at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

CLASS ACTION COMPLAINT

263. In failing to disclose the Defect and the associated safety risks and repair costs that result from it, HMA, HMC, KA, and KC have knowingly and intentionally concealed material facts and breached their duty to disclose.

264. KA also engaged in unfair and deceptive conduct by issuing the 2023 Recall that does not actually provide a remedy for the Defect, does not notify Class Members about the continued safety risks created by the Defect, does not instruct consumers to stop driving the dangerous Class Vehicles, and does not notify consumers and offer them free loaner vehicles of comparable make, model, or value as their own Class Vehicles to enable them to cease driving their dangerous Class Vehicles until a remedy is available and can be implemented.

265. By misrepresenting the Class Vehicles as safe and reliable and by failing to disclose and actively concealing the dangers and risks posed by the Defect, Defendants engaged in one or more of the following unfair or deceptive business practices as defined in Cal. Civ. Code § 1770(a)(2)(5), (7), (9), and (16).

266. Defendants intended for Plaintiffs and Class Members to rely on them to provide adequately designed Class Vehicles, and to honestly and accurately reveal the safety hazards described above.

267. The facts concealed or not disclosed by HMA, HMC, KA, and KC to Plaintiffs and the Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Class Vehicles or pay a lesser price. Had Plaintiffs and the Class known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

268. Defendants' unfair or deceptive acts or practices were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles' hybrid system was safe and reliable, and that the Class Vehicles were not affected by the Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers,

including Plaintiffs and Class Members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

269. Defendants' misrepresentations, omissions, and concealment of material facts regarding the Defect and true characteristics of the Class Vehicles were material to the decisions of Plaintiffs and Class Members to purchase and lease those vehicles, as Defendants intended. Plaintiffs and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendants' misrepresentations that the Class Vehicles were safe and reliable in deciding to purchase and lease Class Vehicles.

270. Plaintiffs' and Class Members' reliance was reasonable, as they had no way of discerning Defendants' representations were false and misleading, or otherwise learning that the Class Vehicles contained the Defect, as alleged above. Plaintiffs and Class Members did not, and could not, unravel Defendants' deception on their own.

271. Had they known the truth about the Defect, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

272. Plaintiffs and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

273. Defendants' violations present a continuing risk to Plaintiffs and Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Defect. Defendants' unlawful acts and practices complained of herein affect the public interest.

274. In accordance with § 1782(a) of the CLRA, Plaintiffs' counsel on behalf of Plaintiffs and the Class Members, served Defendants via Certified Mail on March 4, 2024, with notice of their alleged violations of Cal. Civ. Code § 1770(a) relating to the Class Vehicles purchased by Plaintiffs and Class Members and demanded that they

correct or agree to correct the actions described therein within thirty (30) days of such notice.

275. Plaintiffs and the Class members seek equitable relief and will amend this claim to seek damages after the notice period.

**SECOND CAUSE OF ACTION**

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**

**Cal. Bus. & Prof. Code § 17200 ("UCL")**

(Individually and on behalf of the Nationwide Class)
(As to all Defendants)

276. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

277. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

278. HMA, HMC, KA, and KC have engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs and the Class Members that the Class Vehicles suffer from a defect (and the costs, safety risks, and diminished value of the vehicles as a result of these problems). Defendants should have disclosed this information because they were in a superior position to know the true facts related to the defect, and Plaintiffs and Class Members could not reasonably be expected to learn or discover the true facts related to the defect.

279. The defective ECAs constitute a safety issue that triggered each Defendant's duty to disclose the safety issue to consumers.

280. These acts and practices have deceived Plaintiffs and are likely to deceive the public. In failing to disclose the defect and suppressing other material facts from Plaintiffs and the Class Members, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and the Class Members. The omissions and acts of concealment by Defendants pertained to information that was

material to Plaintiffs and the Class Members, as it would have been to all reasonable consumers.

281. A business practice is unlawful under the UCL if it is forbidden by any law. Defendants' acts, conduct, and practices were unlawful, in that they constituted, among others, violations of the CLRA, and/or express and implied warranties.

282. The injuries suffered by Plaintiffs and the Class Members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and the Class Members should have reasonably avoided.

283. HMA, HMC, KA, and KC knew or should have known that their conduct violated the UCL.

284. Plaintiffs seek to enjoin further unlawful, unfair and/or fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

**THIRD CAUSE OF ACTION**

**VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW**

**Cal. Bus. & Prof. Code § 17500, *et seq*. ("FAL")**

(Individually and on behalf of the Nationwide Class)
(As to all Defendants)

285. Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

286. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against HMA, HMC, KA, and KC.

287. California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any

CLASS ACTION COMPLAINT

other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

288. HMA, HMC, KA, and KC caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants to be untrue and misleading to consumers, including Plaintiffs and the other Class Members.

289. HMA, HMC, KA, and KC have violated section 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of the Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

290. Plaintiffs and the other Class Members have suffered an injury in fact, including the loss of money or property, as a result of HMA's, HMC's, KA's, and KC's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiffs and the other Class Members relied on the misrepresentations and/or omissions of HMA, HMC, KA, and KC with respect to the safety and reliability of the Class Vehicles. HMA's, HMC's, KA's, and KC's representations were untrue because the Class Vehicles are distributed with a safety Defect. Had Plaintiffs and the other Class Members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them. Accordingly, Plaintiffs and the other Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

291. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of HMA's, HMC's, KA's, and KC's businesses. HMA's and KA's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

292. Plaintiffs, individually and on behalf of the other Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin HMA, HMC,

KA, and KC from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class Members any money HMA, HMC, KA, and KC acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**FOURTH CAUSE OF ACTION**

**BREACH OF IMPLIED WARRANTY**

**Cal. Com. Code §§ 2314 and 10212**

(Individually and on behalf of the Nationwide Class)
(As to HMA and KA)

293.  Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

294.  Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against HMA and KA.

295.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

296.  Defendants are and were at all relevant times "merchants" of motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

297.  Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

298.  All Class Members who purchased Class Vehicles are "buyers" within the meaning of Cal. Com. Code § 2103(1)(a).

299.  All Class Members who leased Class Vehicles are "lessees" within the meaning of Cal. Com. Code § 10103(a)(14).

300.  The Class Vehicles were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

301. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants provided Plaintiffs and the Class Members with an implied warranty that the Class Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold. This implied warranty included, among other things, a warranty that the Class Vehicles were manufactured, supplied, distributed, and sold by Defendants, were safe and reliable for providing transportation, and would not be vulnerable to spontaneous engine compartment fires or stalling when driven.

302. However, the Class Vehicles did not comply with the implied warranty of merchantability because they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for their ordinary purpose of providing reasonably reliable, safe, and secure transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles contained the Defect, resulting in a substantial safety hazard because the Defect renders Class Vehicles vulnerable to spontaneous engine compartment fires or stalling when driven.

303. Plaintiffs and other Class members have had sufficient direct dealings with either Defendants (KA and HMA) or its agents (e.g., dealerships, consumer affairs departments, and technical support) to establish privity of contract between HMA or KA on one hand, and Plaintiffs and each of the other Class members on the other hand.

304. In addition, HMA and KA directly communicated with Plaintiffs and Class Members via its television, print, and online advertisements. HMA and KA also issued vehicle warranties directly to Plaintiffs and Class Members. Plaintiffs and other Class Members also relied on HMA's and KA's direct representations regarding the high quality, durability, reliability, dependability, and functionality of Kia and Hyundai vehicles in making their purchasing decision.

305. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Defendant and their dealers, and specifically, of Defendant's express warranties. The

dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Additionally, privity is excused here because Plaintiffs and each of the other Class members relied on statements made by Defendants themselves in choosing to purchase or lease a Class Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform and was controlled and disseminated directly by Defendants. Another independent basis exists to excuse privity here because Plaintiffs purchased their Class Vehicles from authorized Hyundai and Kia dealerships, which are Defendants' agents. As alleged above, Defendants substantially control the marketing of the Class Vehicles, if and how dealerships are to perform warranty repairs for defective components, and how dealerships are to perform the purported "remedies" for safety defects subject to recalls.

306. Any attempt by Defendants to disclaim or limit the implied warranty of merchantability for their respective Class Vehicles vis-à-vis consumers is unconscionable and unenforceable. Specifically, Defendants' warranty limitations are unenforceable because Defendants knowingly sold or leased defective Class Vehicles without informing consumers about the Defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Plaintiffs and other Class Members. Additionally, Defendants knew of the Defect at the time of sale.

307. Furthermore, the circumstances described herein caused Defendants' exclusive or limited remedy to fail its essential purpose such that the Plaintiffs and Class Members may seek alternative remedies. Indeed, these breaches of warranties have denied Plaintiffs and Class Members the benefit of their respective bargains, which

presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever–present risk of vehicle stalls and fires.

308.  Defendants have actual knowledge of the Defect as alleged herein, satisfying any notice requirement. Moreover, due to Defendants' failure to remedy the Defect, any notice requirement is futile.

309. Plaintiffs and Class Members have provided Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of internal investigations, complaints made directly to KA and HMA and their authorized dealers, Class Members taking their vehicles to their dealers, public complaints filed with NHTSA and made online, the 2023 Recall, this lawsuit and the individual notice letter sent by Plaintiffs on March 4, 2024, within a reasonable amount of time after the Defect became public.

310. Alternatively, Plaintiffs and the Class Members were excused from providing Defendants with notice and an opportunity to cure the breach, because it would have been futile. As alleged throughout Plaintiffs' Complaint, Defendants have long known that the Class Vehicles contained the Defect; however, to date, Defendants have not instituted an adequate and meaningful repair program with respect to the Class Vehicles. As such, Plaintiffs and Class Members had no reason to believe that Defendants would have adequately repaired the Defect if they presented their Class Vehicles to them for repair.

311. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs' and Class Members' Class Vehicles were and are defective, and the Defect in their Class Vehicles has not been remedied. Therefore, Plaintiffs and Class Members have been damaged, in an amount to be proven at trial.

# FIFTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY
### Cal. Com. Code §§ 2313 and 10214

(Individually and on behalf of the Nationwide Class)
(As to HMA and KA)

312.  Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

313.  Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against HMA and KA.

314.  Defendants are and were at all relevant times "merchants" of motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

315.  Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

316.  KA provides a 10-year/100,000 mile Hybrid System Warranty with every Class Vehicle. The Hybrid System Warranty expressly warrants that it "cover[s]" "[r]epair or replacement of HYBRID SYSTEM components," that were "originally manufactured or installed by Kia Motor Company, Kia Motors Manufacturing Georgia (KMMG) or Kia Motor America (KMA) that are found to be defective in material or factory workmanship under normal use and maintenance[.]"[179] KA specifies that the warranty provides for the "[r]epair or replacement of HYBRID SYSTEM components," which include "Hybrid Battery Pack Assy, Hybrid Starter & Generator, Hybrid Power Control Unit, Traction Motor, clutch, On board charger(OBC) and all internal parts."[180]

317.  HMA too offers a 10-year/1000,000 mile Hybrid and Plug-in Hybrid System Warranty, which covers: "[r]epair or replacement of HYBRID SYSTEM components …

---

[179] 2020 Warranty and Consumer Information Manual, at 14, *available at* https://www.kiatechinfo.com/ext_If/kma_owner_portal/content_pop.aspx (last accessed March 19, 2024).
[180] *Id.*

originally manufactured or installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai Motor Manufacturing Alabama (HMMA), Kia Motors Manufacturing Georgia (KMMG), Kia Manufacturing Mexico (KMM) or Hyundai Motor America (HMA) that are found to be defective in material or factory workmanship under normal use and maintenance[.]"[181] HMA states that the components covered by this warranty are those "that are directly attached to or integral to operation of the Hybrid Battery; Hybrid Battery Wire Harness; Battery Management System and Wire Harness; Blower Assembly; Electronic Air Compressor; Active Air Flap Active Hydraulic Booster; EV Fuse; Service Disconnect Plug; Power Relay Assembly; Hybrid Starter & Generator; Auto Transmission & Traction Motor including housing case; clutch and all internal parts; Hybrid Power Control Unit; Electronic Oil Pump Assembly; Electronic Water Pump with In and Out Hose Module."[182]

318.  KA and HMA breached their written warranties by failing to repair or replace the defective ECAs installed in the Class Vehicles when Plaintiffs and the Class Members presented their Class Vehicles to authorized Kia and Hyundai dealers. Despite their knowledge that the ECAs found in Plaintiffs' and Class Members' vehicles contained a Defect that makes them prone to vehicle fires and stalling, KA failed to repair or replace the defective ECAs.

319.  KA and HMA failed to perform their written warranty obligations as part of a uniform pattern and practice that extended to all of their dealerships.

320.  The warranties formed the basis of the bargain that was reached when Plaintiffs and Class Members purchased or leased their Class Vehicles. Plaintiffs and Class Members experienced the Defect within the warranty period and presented their Class Vehicles for repairs within the warranty period. Despite the existence of the

---

[181]https://owners.hyundaiusa.com/content/dam/hyundai/us/myhyundai/manuals/factory-warranty/2019/Hyundai%20USA%20ALL%20119MY.pdf (last accessed March 19, 2024).

[182] *Id.*

express warranty and Plaintiffs and Class Members presenting their Class Vehicles to Kia and Hyundai dealerships on multiple occasions, KA and HMA failed to inform Plaintiff and Class Members of the Defect and failed to adequately repair the Defect or replace the defective ECAs.

321. Plaintiffs and other Class members have had sufficient direct dealings with either Defendants (KA and HMA) or its agents (e.g., dealerships, consumer affairs departments, and technical support) to establish privity of contract between HMA or KA on one hand, and Plaintiffs and each of the other Class members on the other hand.

322. In addition, HMA and KA directly communicated with Plaintiffs and Class Members via its television, print, and online advertisements. HMA and KA also issued vehicle warranties directly to Plaintiffs and Class Members. Plaintiffs and other Class Members also relied on HMA's and KA's direct representations regarding the high quality, durability, reliability, dependability, and functionality of Kia and Hyundai vehicles in making their purchasing decision.

323. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of Defendants' express warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Additionally, privity is excused here because Plaintiffs and each of the other Class members relied on statements made by Defendants themselves in choosing to purchase or lease a Class Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform and was controlled and disseminated directly by Defendants. Another independent basis exists to excuse privity here because Plaintiffs purchased their Class Vehicles from authorized Hyundai and Kia dealerships, which are Defendants' agents. As alleged above, Defendants substantially control the marketing of the Class Vehicles, if and how

dealerships are to perform warranty repairs for defective components, and how dealerships are to perform the purported "remedies" for safety defects subject to recalls.

324. As a result of KA's and HMA's breach of their express warranties, Plaintiffs and Class Members have suffered economic damages including, but not limited to, the loss of the benefit of their bargain, loss of vehicle use, diminished value, and substantial loss in value and resale value.

325. Defendants have actual knowledge of the Defect as alleged herein, satisfying any notice requirement. Moreover, due to Defendants' failure to remedy the Defect, any notice requirement is futile.

326. Plaintiffs and Class Members have provided Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of internal investigations, complaints made directly to KA and HMA or their authorized dealers, Class Members taking their vehicles to their dealers, public complaints filed with NHTSA and made online, the 2023 Recall, this lawsuit and the individual notice letter sent by Plaintiffs on March 4, 2024, within a reasonable amount of time after the Defect became public.

327. Plaintiff and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of such obligations as a result of HMA's and KA's conduct described herein.

328. In their capacities as suppliers and/or warrantors, and by the conduct described herein, any attempt by KA or HMA to limit their express warranty in a manner that would exclude or limit coverage for the Defect, including benefit-of-the-bargain, incidental, or consequential damages, would cause the warranty to fail its essential purpose. Plaintiffs and Class Members have presented their Class Vehicles to HMA's and KA's authorized dealers and HMA and KA have failed to repair or replace the defective ECAs installed in their vehicles. As a result, Plaintiffs and Class Members are left with defective vehicles that do not function as intended and, therefore, have been deprived of the benefit of their bargains.

329.  In their capacities as suppliers and/or warrantors, and by the conduct described herein, any attempt by KA or HMA to limit their express warranty in a manner that would exclude or limit coverage for the Defect would be unconscionable. HMA's and KA's warranties were adhesive and did not permit negotiations. HMA and KA possessed superior knowledge of the Defect, which is a latent defect, prior to offering Class Vehicles for sale. HMA and KA concealed and did not disclose this Defect, and KA did not remedy the Defect prior to sale (or afterward).

## SIXTH CAUSE OF ACTION
## STRICT PRODUCT LIABILITY

(Individually and on behalf of the Nationwide Class, or in the alternative, the State Classes)
(As to all Defendants)

330.  Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

331.  Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against HMC, HMA, KA, and KC, under the law of California. In the alternative to a Nationwide Class, this claim is brought on behalf of the State-specific Classes.

332.  By placing an unreasonably dangerous product in the stream of commerce, Defendants are strictly liable.

333.  Defendants are strictly liable for designing, engineering, testing, validating, manufacturing, marketing, and placing in the stream of commerce the Class Vehicles which are unreasonably dangerous and defective due to the ECA Defect.

334.  Defendants designed, engineered, tested, validated, manufactured, marketed, and placed in the stream of commerce the Class Vehicles which are unreasonably dangerous and defective due to the ECA Defect.

335.  The Class Vehicles and ECAs installed therein are being used in an intended and/or foreseeable manner. Plaintiffs and Class Members have not misused or materially altered the Class Vehicles or the ECAs. The Class Vehicles and ECAs are in the same or substantially similar condition as they were at the time of purchase or lease.

336. The Class Vehicles and ECAs are unreasonably dangerous and defective because they were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce with the Defect that can cause Class Vehicles to suddenly and unexpectedly stall, lose engine power, or catch fire.

337. The Defect causes an unreasonably dangerous condition when Class Vehicles are used for their intended and foreseeable purpose of providing safe and reliable transportation and places Plaintiffs, Class Members, and others on the road at an unreasonable and substantial risk for injury or death.

338. Defendants were aware of feasible alternative designs which would minimize or eliminate the Defect and the risk it poses. Such alternative designs were known and available when the Class Vehicles and ECAs were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce.

339. Defendants failed to design, test, validate, manufacture, and place in the stream of commerce a Class Vehicle and ECA that is free from the Defect and the unreasonable safety risks it poses.

340. The Defect causes damage to property other than the ECA itself, including damage to other components of the Class Vehicles as a result of a fire and all other property located within the vehicles.

341. As a direct and proximate result of Defendants' actions as described herein, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**

**UNJUST ENRICHMENT**

(Individually and on behalf of the Nationwide Class)
(As to all Defendants)

342. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

343.  This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiffs and the Nationwide Class against HMA, HMC, KA, and KC. A Nationwide Class is appropriate because the elements of unjust enrichment are uniform in all the states. In the alternative to a Nationwide Class, this claim is brought on behalf of the State-specific Classes.

344.  When they purchased and leased the Class Vehicles, Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

345.  Plaintiffs and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the Defect at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

346.  Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Defect, yet they failed to disclose this knowledge and misled the Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

347.  It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

348.  Plaintiffs and Class Members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

349.  Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs will have no adequate legal remedy.

# EIGHTH CAUSE OF ACTION

## VIOLATION OF THE DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW

### Mass. Gen. Laws ch. 93a, § 1, *et seq.*

(Individually and on behalf of the Massachusetts Class)
(As to KA and KC)

350.  Plaintiff Doucette incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

351.  Plaintiff Doucette brings this claim on behalf of herself and the Massachusetts Class against KC and KA ("Defendants" for this Cause of Action).

352.  Defendants, Plaintiff, and Class Members are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

353.  Defendants were and are engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

354.  The Massachusetts consumer protection law ("Massachusetts Act") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Mass. Gen. Laws ch. 93A, § 2.

355.  In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Massachusetts Act by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the quality, reliability, and safety of the Class Vehicles and the Defect, as detailed above.

356.  Defendants had an ongoing duty to the Plaintiff and Class Members to refrain from unfair or deceptive practices under the Massachusetts Act in the course of their business. Specifically, Defendants owed the Massachusetts Plaintiff and Class Members a duty to disclose all the material facts concerning the Defect in the Class Vehicles because, as detailed above:

a    Defendants had exclusive access to and far superior knowledge about facts regarding the Defect and Defendants knew these facts were not known to or reasonably discoverable by Plaintiff or Class Members;

b. Given the Defect's hidden and technical nature, Plaintiff and Class Members lack the sophisticated expertise in vehicle components that would be necessary to discover the Defect on their own;

c. Defendants knew that the Defect gave rise to safety concerns for the consumers who use the Class Vehicles, and the Defect would have been a material fact to the Class Members' decisions to buy or lease Class Vehicles; and

d. Defendants made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, HMA, and KA intentionally concealed, suppressed, and failed to disclose to the consumers that the Class Vehicles contained the Defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, HMA and KA had the duty to disclose the whole truth.

357. As detailed above, the information concerning the Defect was known to Defendants at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

358. By misrepresenting the Class Vehicles as safe and reliable and by failing to disclose and actively concealing the dangers and risks posed by the Defect, Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices prohibited by Mass. Gen. Laws ch. 93A, § 2.

359. KA also engaged in unfair and deceptive conduct by issuing the 2023 Recall that does not actually provide a remedy for the Defect, does not notify Class Members about the continued safety risks created by the Defect, does not instruct consumers to stop driving the dangerous Class Vehicles, and does not notify consumers and offer them free loaner vehicles of comparable make, model, or value as their own Class Vehicles to enable them to cease driving their dangerous Class Vehicles until a remedy is available and can be implemented.

360. Defendants intended for Plaintiff and Class Members to rely on them to provide adequately designed and/or manufactured Class Vehicles, and to honestly and accurately reveal the safety hazards described above.

361. Defendants' unfair methods of competition and unfair or deceptive acts or practices were designed to mislead and create a false impression in consumers that the Class Vehicles contained safe and reliable hybrid engine systems, and that the Class Vehicles were not affected by the Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including the Plaintiff and Class Members, about the true safety and reliability of Class Vehicles, the quality of Class Vehicles, and the true value of Class Vehicles.

362. Defendants' misrepresentations, concealments, omissions, and suppressions of material facts were material regarding the Defect and true characteristics of the Class Vehicles were material to the decisions of Plaintiff and Class Members to purchase and lease those vehicles, as Defendants intended. Plaintiff and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendants' misrepresentations that the Class Vehicles were safe and reliable in deciding to purchase and lease the Class Vehicles.

363. Plaintiff's and Class Members' reliance was reasonable, as they had no way of discerning that Defendants' representations were false and misleading and/or otherwise learning that the Class Vehicles contained the Defect, as alleged above. Plaintiff and Class Members did not, and could not, unravel Defendants' deception on their own.

364. Had they known the truth about the Defect, Plaintiff and Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

365. Plaintiff and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

366. Defendants' violations present a continuing risk to Plaintiff and Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Defect. Defendants' unlawful acts and practices complained of herein affect the public interest.

367. On March 4, 2024, Plaintiff sent notice pursuant to Mass. Gen. Laws ch. 93A, § 9(3). Additionally, all Defendants were provided notice of the issues raised in this Count and this Complaint by way of internal investigations, complaints made directly to Defendants and their authorized dealers, Class Members taking their vehicles to their dealers, public complaints filed with NHTSA and made online, the 2023 Recall, this lawsuit and the individual notice letter sent by Plaintiffs on March 4, 2024, within a reasonable amount of time after the Defect became public. Because Defendants failed to remedy their unlawful conduct, Plaintiff seeks all damages and relief to which Class Members are entitled.

368. KA and KC were provided notice of the issues complained of herein within a reasonable time by numerous complaints online, complaints made directly to Defendants and their authorized dealers, Class Members taking their vehicles to their dealers, by Plaintiff on March 4, 2024, through the 2023 Recall, and this lawsuit.

369. Alternatively, providing notice to Defendants and an opportunity to cure the breach prior to filing suit would have been futile. As alleged above, Defendants have long known that the Class Vehicles contained the Defect, however, did nothing to remedy the Defect.

370. Pursuant to Mass. Gen. Laws ch. 93A, § 9, the Plaintiff and Class Members seek an order enjoining Defendants' unfair methods of competition and unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Massachusetts Act.

# NINTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Mass. Gen. Laws ch. 106, §§ 2-314 and 2A-212

(Individually and on behalf of the Massachusetts Class)
(As to KA)

371. Plaintiff Doucette incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

372. Plaintiff Doucette brings this claim on behalf of herself and the Massachusetts Class against KA ("Defendant" for this Cause of Action).

373. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Mass. Gen. Laws ch. 106, §§ 2-314 and 2A-212.

374. Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Mass. Gen. Laws ch. 106, §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

375. Defendant is and was at all relevant times a "lessor" of motor vehicles under Mass. Gen. Laws ch. 106, § 2A-103(1)(p).

376. All Class Members who purchased Class Vehicles in Massachusetts are "buyers" within the meaning of Mass. Gen. Laws ch. 106, § 2-103(1)(a).

377. All Class Members who leased Class Vehicles in Massachusetts are "lessees" within the meaning of Mass. Gen. Laws ch. 106, § 2A-103(1)(n).

378. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106, §§ 2-105(1) and 2A-103(1)(h).

379. Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendant provided Plaintiff and the Class Members with an implied warranty that the Class Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold. This implied warranty included, among other things, a warranty that the Class Vehicles were manufactured, supplied, distributed, and sold by Defendant, were safe and reliable for providing

92

transportation, and would not be vulnerable to spontaneous engine compartment fires or stalling when driven.

380.  However, the Class Vehicles did not comply with the implied warranty of merchantability because they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for their ordinary purpose of providing reasonably reliable, safe, and secure transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles contained the Defect, resulting in a substantial safety hazard because the Defect renders Class Vehicles vulnerable to spontaneous engine compartment fires or stalling when driven.

381.  Plaintiff and other Class members have had sufficient direct dealings with either Defendant or its agents (e.g., dealerships, consumer affairs departments, and technical support) to establish privity of contract between Defendant on one hand, and Plaintiffs and each of the other Class members on the other hand.

382.  In addition, KA directly communicated with Plaintiff and Class Members via its television, print, and online advertisements. KA also issued vehicle warranties directly to Plaintiff and Class Members. Plaintiff and other Class Members also relied on KA's direct representations regarding the high quality, durability, reliability, dependability, and functionality of Kia vehicles in making their purchasing decision.

383.  Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between Defendant and its dealers, and specifically, of Defendant's express warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Additionally, privity is excused here because Plaintiff and each of the other Class members relied on statements made by Defendant itself in choosing to purchase or lease a Class Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform and was controlled and disseminated directly by Defendant. Another independent basis exists to excuse

privity here because Plaintiff purchased her Class Vehicle from an authorized Kia dealership, which is Defendant's agent. As alleged above, Defendant substantially controls the marketing of the Class Vehicles, if and how dealerships are to perform warranty repairs for defective components, and how dealerships are to perform the purported "remedies" for safety defects subject to recalls.

384. Any attempt by Defendant to disclaim or limit the implied warranty of merchantability for their respective Class Vehicles vis-à-vis consumers is unconscionable and unenforceable. Specifically, Defendant's warranty limitations are unenforceable because Defendant knowingly sold or leased defective Class Vehicles without informing consumers about the Defect. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and Plaintiff and other Class Members. Additionally, Defendant knew of the Defect at the time of sale.

385. Furthermore, the circumstances described herein caused Defendant's exclusive or limited remedy to fail its essential purpose such that the Plaintiff and Class Members may seek alternative remedies. Indeed, these breaches of warranties have denied Plaintiff and Class Members the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever–present risk of vehicle stalls and fires.

386. Defendants have actual knowledge of the Defect as alleged herein, satisfying any notice requirement. Moreover, due to Defendants' failure to remedy the Defect, any notice requirement is futile.

387. Plaintiffs and Class Members have provided KA with reasonable notice and opportunity to cure the breaches of their implied warranties by way of internal investigations, complaints made directly to KA and its authorized dealers, Class

Members taking their vehicles to its dealers, public complaints filed with NHTSA and made online, the 2023 Recall, this lawsuit and the individual notice letter sent by Plaintiffs on March 4, 2024, within a reasonable amount of time after the Defect became public.

388.  Alternatively, Plaintiff and the Class Members were excused from providing Defendant with notice and an opportunity to cure the breach, because it would have been futile. As alleged throughout Plaintiffs' Complaint, Defendant has long known that the Class Vehicles contained the Defect; however, to date, Defendant has not instituted an adequate and meaningful repair program with respect to the Class Vehicles. As such, Plaintiff and Class Members had no reason to believe that Defendant would have adequately repaired the Defect if they presented their Class Vehicles to them for repair.

389. As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff's and Class Members' Class Vehicles were and are defective, and the Defect in their Class Vehicles has not been remedied. Therefore, Plaintiff and Class Members have been damaged, in an amount to be proven at trial.

**TENTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY,**
**Mass. Gen. Laws ch. 106, §§ 2-313, 2A-103 and 2A-210 *et seq*.**
(Individually and on behalf of the Massachusetts Class)
(As to KA)

390.  Plaintiff Doucette incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

391. Plaintiff Doucette brings this claim on behalf of herself and the Massachusetts Class against KA ("Defendant" for this Cause of Action).

392.  Defendant is and was at all relevant times a "merchant" of motor vehicles under Mass. Gen. Laws ch. 106, § 2-104(a), and a "seller" and "lessor" of motor vehicles under § 2-103(1)(d) and § 2A-103(1)(p).

393. The Massachusetts Class Members are and were at all relevant times "buyers" with respect to the Class Vehicles under Mass. Gen. Laws ch. 106, § 2-103(1)(a).

394. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§2-105(1) and 2A-103(1)(h).

395. KA provides a 10-year/100,000 mile Hybrid System Warranty with every Class Vehicle. The Hybrid System Warranty expressly warrants that it "cover[s]" "[r]epair or replacement of HYBRID SYSTEM components," that were "originally manufactured or installed by Kia Motor Company, Kia Motors Manufacturing Georgia (KMMG) or Kia Motor America (KMA) that are found to be defective in material or factory workmanship under normal use and maintenance[.]"[183] KA specifies that the warranty provides for the "[r]epair or replacement of HYBRID SYSTEM components," which include "Hybrid Battery Pack Assy, Hybrid Starter & Generator, Hybrid Power Control Unit, Traction Motor, *clutch*, On board charger(OBC) *and all internal parts*."[184]

396. KA breached its written warranties by failing to provide an adequate repair when Plaintiff and the Class Members presented their Class Vehicles to authorized Kia dealers. Despite its knowledge that the ECAs found in Plaintiff's and Class Members' vehicles contained a Defect that makes them prone to vehicle fires and stalling, KA failed to repair or replace the defective ECAs.

397. KA failed to perform its written warranty obligations as part of a uniform pattern and practice that extended to all of its dealerships.

398. The warranties formed the basis of the bargain that was reached when Plaintiff and Class Members purchased or leased their Class Vehicles. Plaintiff and Class Members experienced the Defect within the warranty period and presented their Class

---

[183] 2020 Warranty and Consumer Information Manual, at 14, *available at* https://www.kiatechinfo.com/ext_If/kma_owner_portal/content_pop.aspx (last accessed on March 19, 2024).

[184] *Id.*

Vehicles for repairs within the warranty period. Despite the existence of the express warranty and Plaintiff and Class Members presenting their Class Vehicles to Kia dealerships on multiple occasions, KA failed to inform Plaintiff and Class Members of the Defect and failed to adequately repair the Defect.

399. Plaintiff and other Class members have had sufficient direct dealings with either Defendant or its agents (e.g., dealerships, consumer affairs departments, and technical support) to establish privity of contract between Defendant on one hand, and Plaintiffs and each of the other Class members on the other hand.

400. In addition, KA directly communicated with Plaintiff and Class Members via its television, print, and online advertisements. KA also issued vehicle warranties directly to Plaintiff and Class Members. Plaintiff and other Class Members also relied on KA's direct representations regarding the high quality, durability, reliability, dependability, and functionality of Kia vehicles in making their purchasing decision.

401. Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between Defendant and its dealers, and specifically, of Defendant's express warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Additionally, privity is excused here because Plaintiff and each of the other Class members relied on statements made by Defendant itself in choosing to purchase or lease a Class Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform and was controlled and disseminated directly by Defendant. Another independent basis exists to excuse privity here because Plaintiff purchased her Class Vehicle from an authorized Kia dealership, which is Defendant's agent. As alleged above, Defendant substantially controls the marketing of the Class Vehicles, if and how dealerships are to perform warranty repairs for defective components, and how dealerships are to perform the purported "remedies" for safety defects subject to recalls.

402. As a result of KA's breach of its express warranty, Plaintiff and Class Members have suffered economic damages including, but not limited to, the loss of the benefit of their bargain, loss of vehicle use, diminished value, and substantial loss in value and resale value.

403. Plaintiff and Class Members have provided KA with reasonable notice and opportunity to cure the breaches of their implied warranties by way of internal investigations, complaints made directly to KA and its authorized dealers, Class Members taking their vehicles to its dealers, public complaints filed with NHTSA and made online, the 2023 Recall, this lawsuit and the individual notice letter sent by Plaintiffs on March 4, 2024, within a reasonable amount of time after the Defect became public.

404. Plaintiff and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of such obligations as a result of KA's conduct described herein.

405. In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by KA to limit its express warranty in a manner that would exclude or limit coverage for the Defect, including benefit-of-the-bargain, incidental, or consequential damages, would cause the warranty to fail in its essential purpose. Plaintiff and Class Members have presented their Class Vehicles to KA's authorized dealers and KA has failed to repair or replace the defective ECAs installed in their vehicles. As a result, Plaintiff and Class Members are left with defective vehicles that do not function as intended and, therefore, have been deprived of the benefit of their bargains.

406. In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by KA to limit its express warranty in a manner that would exclude or limit coverage for the Defect would be unconscionable. KA's warranties were adhesive and did not permit negotiations. KA possessed superior knowledge of the Defect, which is a latent defect, prior to offering Class Vehicles for sale. KA concealed

and did not disclose this Defect, and KA did not remedy the Defect prior to sale (or afterward).

**ELEVENTH CAUSE OF ACTION**

**BREACH OF EXPRESS WARRANTY**

**Ga. Code. Ann. §§ 11-2-313 and 11-2A-210**

(Individually and on behalf of the Georgia Class)

(As to HMA)

407.  Plaintiff Tongue incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

408.  Plaintiff Tongue brings this claim on behalf of herself and the Massachusetts Class against HMA ("Defendant" for this Cause of Action).

409.  Defendant was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

410.  With respect to leases, Defendant is and was at all relevant times "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

411.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

412.  HMA offers a 10-year/1000,000 mile Hybrid and Plug-in Hybrid System Warranty, which covers: "[r]epair or replacement of HYBRID SYSTEM components… originally manufactured or installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai Motor Manufacturing Alabama (HMMA), Kia Motors Manufacturing Georgia (KMMG), Kia Manufacturing Mexico (KMM) or Hyundai Motor America (HMA) that are found to be defective in material or factory workmanship under normal use and maintenance[.]"[185] HMA states that the components covered by this warranty are

---

[185] https://owners.hyundaiusa.com/content/dam/hyundai/us/myhyundai/manuals/factory-warranty/2019/Hyundai%20USA%20ALL%20119MY.pdf (last accessed March 19, 2024).

99

those "that are directly attached to or integral to operation of the Hybrid Battery; Hybrid Battery Wire Harness; Battery Management System and Wire Harness; Blower Assembly; Electronic Air Compressor; Active Air Flap Active Hydraulic Booster; EV Fuse; Service Disconnect Plug; Power Relay Assembly; Hybrid Starter & Generator; Auto Transmission & Traction Motor including housing case; clutch and all internal parts; Hybrid Power Control Unit; Electronic Oil Pump Assembly; Electronic Water Pump with In and Out Hose Module."[186]

413.  HMA breached its written warranties by failing to provide an adequate repair when Plaintiff and the Class Members presented their Class Vehicles to authorized Hyundai dealers. Despite its knowledge that the ECAs found in Plaintiff's and Class Members' vehicles contained a Defect that makes them prone to vehicle fires and stalling, HMA failed to repair or replace the defective ECAs.

414.  HMA failed to perform its written warranty obligations as part of a uniform pattern and practice that extended to all of its dealerships.

415.  The warranties formed the basis of the bargain that was reached when Plaintiff and Class Members purchased or leased their Class Vehicles. Plaintiff and Class Members experienced the Defect within the warranty period and presented their Class Vehicles for repairs within the warranty period. Despite the existence of the express warranty and Plaintiff and Class Members presenting their Class Vehicles to Hyundai dealerships on multiple occasions, HMA failed to inform Plaintiff and Class Members of the Defect and failed to adequately repair the Defect.

416.  Plaintiff and other Class members have had sufficient direct dealings with either Defendant or its agents (e.g., dealerships, consumer affairs departments, and technical support) to establish privity of contract between Defendant on one hand, and Plaintiffs and each of the other Class members on the other hand.

---

[186] *Id.*

CLASS ACTION COMPLAINT

417. In addition, HMA directly communicated with Plaintiff and Class Members via its television, print, and online advertisements. HMA also issued vehicle warranties directly to Plaintiff and Class Members. Plaintiff and other Class Members also relied on HMA's direct representations regarding the high quality, durability, reliability, dependability, and functionality of Hyundai vehicles in making their purchasing decision.

418. Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between Defendant and its dealers, and specifically, of Defendant's express warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Additionally, privity is excused here because Plaintiff and each of the other Class members relied on statements made by Defendant itself in choosing to purchase or lease a Class Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform and was controlled and disseminated directly by Defendant. Another independent basis exists to excuse privity here because Plaintiff purchased her Class Vehicle from an authorized Hyundai dealership, which is Defendant's agent. As alleged above, Defendant substantially controls the marketing of the Class Vehicles, if and how dealerships are to perform warranty repairs for defective components, and how dealerships are to perform the purported "remedies" for safety defects subject to recalls.

419. As a result of HMA's breach of its express warranty, Plaintiff and Class Members have suffered economic damages including, but not limited to, the loss of the benefit of their bargain, loss of vehicle use, diminished value, and substantial loss in value and resale value.

420. Plaintiffs and Class Members have provided HMA with reasonable notice and opportunity to cure the breaches of their implied warranties by way of internal investigations, complaints made directly to HMA and its authorized dealers, Class

Members taking their vehicles to its dealers, public complaints filed with NHTSA and made online, the 2023 Recall, this lawsuit and the individual notice letter sent by Plaintiffs on March 4, 2024, within a reasonable amount of time after the Defect became public.

421. Plaintiff and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of such obligations as a result of HMA's conduct described herein.

422. In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by HMA to limit its express warranty in a manner that would exclude or limit coverage for the Defect, including benefit-of-the-bargain, incidental, or consequential damages, would cause the warranty to fail in its essential purpose. Plaintiff and Class Members have presented their Class Vehicles to HMA's authorized dealers and HMA has failed to repair or replace the defective ECAs installed in their vehicles. As a result, Plaintiff and Class Members are left with defective vehicles that do not function as intended and, therefore, have been deprived of the benefit of their bargains.

423. In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by HMA to limit its express warranty in a manner that would exclude or limit coverage for the Defect would be unconscionable. HMA's warranties were adhesive and did not permit negotiations. HMA possessed superior knowledge of the Defect, which is a latent defect, prior to offering Class Vehicles for sale. HMA concealed and did not disclose this Defect, and HMA did not remedy the Defect prior to sale (or afterward).

## TWELFTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY
### Ga. Code. Ann. §§ 11-2-314 and 11-2A-212

(Individually and on behalf of the Georgia Class)
(As to HMA)

424.  Plaintiff realleges and incorporate by reference all preceding allegations as though fully set forth herein.

425.  Plaintiff Tongue brings this claim on behalf of herself and the Georgia Class against HMA ("Defendant" for this Cause of Action).

426.  Defendant was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

427.  With respect to leases, Defendant is and was at all relevant times "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

428.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

429.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11- 2-314 and 11-2A-212.

430.  Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendant provided Plaintiff and the Class Members with an implied warranty that the Class Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold. This implied warranty included, among other things, a warranty that the Class Vehicles were manufactured, supplied, distributed, and sold by Defendant, were safe and reliable for providing transportation, and would not be vulnerable to spontaneous engine compartment fires or stalling when driven.

431.  However, the Class Vehicles did not comply with the implied warranty of merchantability because they were defective and not in merchantable condition, would

not pass without objection in the trade, and were not fit for their ordinary purpose of providing reasonably reliable, safe, and secure transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles contained the Defect, resulting in a substantial safety hazard because the Defect renders Class Vehicles vulnerable to spontaneous engine compartment fires or stalling when driven.

432. Plaintiff and other Class members have had sufficient direct dealings with either Defendant or its agents (e.g., dealerships, consumer affairs departments, and technical support) to establish privity of contract between Defendant on one hand, and Plaintiffs and each of the other Class members on the other hand.

433. In addition, KA directly communicated with Plaintiff and Class Members via its television, print, and online advertisements. KA also issued vehicle warranties directly to Plaintiff and Class Members. Plaintiff and other Class Members also relied on KA's direct representations regarding the high quality, durability, reliability, dependability, and functionality of Kia vehicles in making their purchasing decision.

434. Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between Defendant and its dealers, and specifically, of Defendant's express warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Additionally, privity is excused here because Plaintiff and each of the other Class members relied on statements made by Defendant itself in choosing to purchase or lease a Class Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform and was controlled and disseminated directly by Defendant. Another independent basis exists to excuse privity here because Plaintiff purchased her Class Vehicle from an authorized Hyundai dealership, which is Defendant's agent. As alleged above, Defendant substantially controls the marketing of the Class Vehicles, if and how dealerships are to perform

warranty repairs for defective components, and how dealerships are to perform the purported "remedies" for safety defects subject to recalls.

435. Any attempt by Defendant to disclaim or limit the implied warranty of merchantability for their respective Class Vehicles vis-à-vis consumers is unconscionable and unenforceable. Specifically, Defendant's warranty limitations are unenforceable because Defendant knowingly sold or leased defective Class Vehicles without informing consumers about the Defect. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and Plaintiff and other Class Members. Additionally, Defendant knew of the Defect at the time of sale.

436. Furthermore, the circumstances described herein caused Defendant's exclusive or limited remedy to fail its essential purpose such that the Plaintiff and Class Members may seek alternative remedies. Indeed, these breaches of warranties have denied Plaintiffs and Class Members the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever–present risk of vehicle stalls and fires.

437. Defendants have actual knowledge of the Defect as alleged herein, satisfying any notice requirement. Moreover, due to Defendants' failure to remedy the Defect, any notice requirement is futile.

438. Plaintiffs and Class Members have provided HMA with reasonable notice and opportunity to cure the breaches of their implied warranties by way of internal investigations, complaints made directly to KA and its authorized dealers, Class Members taking their vehicles to its dealers, public complaints filed with NHTSA and made online, the 2023 Recall, this lawsuit and the individual notice letter sent by

Plaintiffs on March 4, 2024, within a reasonable amount of time after the Defect became public.

439.  Alternatively, Plaintiff and the Class Members were excused from providing Defendant with notice and an opportunity to cure the breach, because it would have been futile. As alleged throughout Plaintiffs' Complaint, Defendant has long known that the Class Vehicles contained the Defect; however, to date, Defendant has not instituted an adequate and meaningful repair program with respect to the Class Vehicles. As such, Plaintiff and Class Members had no reason to believe that Defendant would have adequately repaired the Defect if they presented their Class Vehicles to them for repair.

440. As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff's and Class Members' Class Vehicles were and are defective, and the Defect in their Class Vehicles has not been remedied. Therefore, Plaintiff and Class Members have been damaged, in an amount to be proven at trial.

**THIRTEENTH CAUSE OF ACTION**

**VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT**

**Ga. Code Ann. § 10-1-370, *et seq*.**

(Individually and on behalf of the Georgia Class)
(As to HMA and HMC)

441. Plaintiff Tongue realleges and incorporates by reference all preceding allegations as though fully set forth herein.

442.  Plaintiff Tongue brings this claim on behalf of herself and the Georgia Class against HMA and HMC ("Defendants" for this Cause of Action).

443. Defendants, Plaintiff, and the Class Members are "persons" within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code. Ann. § 10-1-371(5).

444. The Georgia UDTPA prohibits any "deceptive trade practices," which include misrepresenting the "standard, quality, or grade" of goods or services, and

engaging "in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code. Ann. § 10-1-372(a).

445. In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Georgia UDTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the quality, reliability, and safety of the Class Vehicles and the Defect, as detailed above.

446. Defendants had an ongoing duty to Plaintiff and Class Members to refrain from unfair or deceptive practices under the Georgia UDTPA in the course of their business. Specifically, Defendants owed the Plaintiff and Class Members a duty to disclose all the material facts concerning the Defect in the Class Vehicles because, as detailed above:

a.  Defendants had exclusive access to and far superior knowledge about facts regarding the Defect and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members;

b.  Given the Defect's hidden and technical nature, Plaintiffs and Class Members lack the sophisticated expertise in vehicle components that would be necessary to discover the Defect on their own;

c.  Defendants knew that the Defect gave rise to safety concerns for the consumers who use the Class Vehicles, and the Defect would have been a material fact to the Class Members' decisions to buy or lease Class Vehicles; and

d.  Defendants made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, HMA and KA intentionally concealed, suppressed, and failed to disclose to the consumers that the Class Vehicles contained the Defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, HMA and KA had the duty to disclose the whole truth.

447. As detailed above, the information concerning the Defect was known to Defendants at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

448. By misrepresenting the Class Vehicles as safe and reliable and free from defects, and by failing to disclose and actively concealing the dangers and risks posed by the Defect, Defendants engaged in one or more of the following unfair or deceptive business practices in violation of the Georgia UTPA:

    a.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

    b.    Representing that the Class Vehicles have approval, characteristics, uses, and benefits which they do not have;

    c.    Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

    d.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and

    e.    Engaging in conduct which creates a likelihood of confusion or of misleading persons regarding the Class Vehicles.

Ga. Code. Ann. § 10-1-372(2), (5), (7), (9), (12).

449. Defendants intended for Plaintiff and Class Members to rely on them to provide adequately designed Class Vehicles, and to honestly and accurately reveal the safety hazards described above.

450. Defendants' unfair or deceptive acts or practices were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles were safe, reliable, and made of the highest quality, and that the Class Vehicles were not affected by the Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiffs and Class Members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

451. Defendants' misrepresentations, omissions, and concealment of material facts regarding the Defect and true characteristics of the Class Vehicles were material to

the decisions of Plaintiff and Class Members to purchase and lease those vehicles, as Defendants intended. Plaintiff and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendants' misrepresentations that the Class Vehicles were safe and reliable in deciding to purchase and lease Class Vehicles.

452. Plaintiff's and Class Members' reliance was reasonable, as they had no way of discerning Defendants' representations were false and misleading, or otherwise learning that the Class Vehicles contained the Defect, as alleged above. Plaintiff and Class Members did not, and could not, unravel Defendants' deception on their own.

453. Had they known the truth about the Defect, Plaintiff and Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

454. Plaintiff and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

455. Defendants' violations present a continuing risk to Plaintiff and Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Defect. Defendants' unlawful acts and practices complained of herein affect the public interest.

456. Pursuant to Ga. Code. Ann. § 10-1-373, Plaintiff and the Georgia State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices and any other just and proper relief available under the Georgia UDTPA.

CLASS ACTION COMPLAINT

# FOURTEENTH CAUSE OF ACTION
## VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT
### Ga. Code Ann. § § 10-1-390, *et seq*.

(Individually and on behalf of the Georgia Class)
(As to HMA and HMC)

457. Plaintiff Tongue realleges and incorporates by reference all preceding allegations as though fully set forth herein.

458. Plaintiff Tongue brings this claim on behalf of herself and the Georgia Class against HMA and HMC ("Defendants" for this Cause of Action).

459. The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful. Ga. Code. Ann. § 10-1-393(a).

460. In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Georgia FBPA.

461. As detailed above, the information concerning the Defect was known to Defendants at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

462. By misrepresenting the Class Vehicles as safe and reliable and free from defects, and by failing to disclose and actively concealing the dangers and risks posed by the Defect, Defendants engaged in one or more of the following unfair or deceptive business practices in violation of the Georgia UTPA:

  a. Representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have;

  b. Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; and

  c. Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

Ga. Code. Ann. § 10-1-393(b).

463. Defendants intended for Plaintiff and Class Members to rely on them to provide adequately designed Class Vehicles, and to honestly and accurately reveal the safety hazards described above.

464. Defendants' unfair or deceptive acts or practices were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles were safe, reliable, and made of the highest quality, and that the Class Vehicles were not affected by the Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiff and Class Members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

465. Defendants' misrepresentations, omissions, and concealment of material facts regarding the Defect and true characteristics of the Class Vehicles were material to the decisions of Plaintiff and Class Members to purchase and lease those vehicles, as Defendants intended. Plaintiff and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendants' misrepresentations that the Class Vehicles were safe and reliable in deciding to purchase and lease Class Vehicles.

466. Plaintiff's and Class Members' reliance was reasonable, as they had no way of discerning Defendants' representations were false and misleading, or otherwise learning that the Class Vehicles contained the Defect, as alleged above. Plaintiff and Class Members did not, and could not, unravel Defendants' deception on their own.

467. Had they known the truth about the Defect, Plaintiff and Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

468. Plaintiff and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

469. Defendants' violations present a continuing risk to Plaintiff and Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Defect. Defendants' unlawful acts and practices complained of herein affect the public interest.

470. On March 4, 2024, Plaintiff sent notice pursuant to Ga. Code. Ann. § 10-1-399(b). Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by way of internal investigations, complaints made directly to Defendants and their authorized dealers, Class Members taking their vehicles to its dealers, public complaints filed with NHTSA and made online, the 2023 Recall, this lawsuit and the individual notice letter sent by Plaintiffs on March 4, 2024, within a reasonable amount of time after the Defect became public. Because Defendants failed to remedy their unlawful conduct, Plaintiff seeks all damages and relief to which Class Members are entitled.

471. Alternatively, providing notice to Defendants and an opportunity to cure the breach prior to filing suit would have been futile. As alleged above, Defendants have long known that the Class Vehicles contained the Defect, however, did nothing to remedy the Defect.

472. Pursuant to Ga. Code. Ann. § 10-1-399, Plaintiff and the Georgia State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding any other just and proper relief available under the Georgia FBPA.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that this Court:

a.    Certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' counsel as Class Counsel;

b.      Declare that any applicable statutes of limitations are tolled due to Defendants' fraudulent concealment and that Defendants are estopped from relying on any statutes of limitations in defense;

c.      Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair and/or recall the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class Members with appropriate curative notice regarding the existence and cause of the Defect;

d.      Award Plaintiffs and Class Members actual, compensatory, general, special, incidental, statutory, punitive, and consequential damages, costs, and disgorgement in an amount to be determined at trial;

e.      Award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

f.      Award pre- and post-judgment interest at the maximum legal rate;

g.      Grant leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

h.      Grant all such other relief as is just and proper.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims so triable.


Dated:       April 3, 2024                By:  _/s/ Jennifer A. Lenze_____
                                              Jennifer A. Lenze, CA Bar # 246858
                                              LENZE LAWYERS, PLC.
                                              999 Corporate Drive, Suite 100
                                              Ladera Ranch, CA 92694
                                              Telephone: (310) 322-8800
                                              Facsimile: (310) 322-8811
                                              jlenze@lenzelawyers.com

CLASS ACTION COMPLAINT

Elizabeth A. Fegan (*admission* pending)
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Phone: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

Jonathan D. Lindenfeld (*pro hac vice* forthcoming)
FEGAN SCOTT LLC
305 Broadway, 7th Floor
New York, NY 10007
Phone: 332.216.2101
Fax: 312.264.0100
jonathan@feganscott.com

J. Barton Goplerud (*pro hac vice* forthcoming)
SHINDLER, ANDERSON, GOPLERUD & WEESE PC
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265
Telephone: (515) 223-4567
E-mail: goplerud@sagwlaw.com

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT